57 P.3d 433

**STATE of Hawai'i, by Earl I. ANZAI, Attorney General, Plaintiff–Appellant,**

v.

**CITY AND COUNTY OF HONOLULU, and Roy Amemiya, in his capacity as Director of Finance, Defendants–Appellees.**

No. 23404.

Supreme Court of Hawai'i.

Nov. 7, 2002.

**510**

Diane Erickson and John P. Dellera, Deputy Attorneys General, On the briefs, for plaintiff-appellant.

Lee M. Agsalud and Reid M. Yamashiro, Deputy Corporation Counsels, for defendants-appellees.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by MOON, C.J.

This case involves a dispute between plaintiff-appellant State of Hawai'i (State) and defendant-appellee City and County of Honolulu (County) [1] regarding the power to tax real property. Prior to 1996, real property leased to the State was exempt from taxation, if the terms of the lease contractually obligated the State to pay the tax. When the exemption was repealed by the County, the

State passed a law that purported to renew the exemption for the 1996–97 tax year. When the County refused to honor the State's statutory exemption, the State filed the present lawsuit in the First Circuit Court. Pursuant to the court's May 25, 2000 order denying the State's motion for partial summary judgment and granting summary judgment in favor of the County, final judgment was entered in favor of the County on June 5, 2000 by the Honorable Gail C. Nakatani. On appeal, the State contends that the circuit court erred when it ruled that: (1) the doctrine of sovereign immunity did not operate to bar taxation of real property leased to the State where the State is obligated to pay the tax under the terms of its lease; (2) the State had waived its immunity by implication; (3) Hawai'i Revised Statutes (HRS) § 246–36(2) (1993),[2] which codified the exemption relied on by the State, had lapsed eleven years after the power to tax real property was constitutionally delegated to the County; and (4) Act 227 of the 1996 Session Laws of Hawai'i, which prohibited the County from repealing the exemption for the 1996–97 tax year, was unconstitutional. For the reasons discussed below, we affirm the circuit court's judgment.

## I. BACKGROUND

At one point in Hawaii's history, all taxation authority was unequivocally vested in the State. The 1968 Hawai'i Constitution provided as follows:

> The taxing power shall be reserved to the State except so much thereof as may be delegated by the legislature to the political subdivisions, and the legislature shall have the power to apportion state revenues among the several political subdivisions.

Haw. Const. art. VII, § 3 (1968). However, following the 1978 State Constitutional Convention, article VII, section 3 of the Hawai'i Constitution was renumbered and amended to include a provision vesting exclusive taxation authority over real property in the coun-

---

1. Roy Amemiya, in his capacity as Director of Finance, was also a named defendant in this lawsuit.

2. HRS § 246–36(2) created a real property tax exemption for "[r]eal property under lease to the State or any county under which lease the lessee is required to pay the taxes upon such property."

ties. Currently, the relevant section reads as follows:

The taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the political subdivisions, and *except that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties*, with the exception of the county of Kalawao. The legislature shall have the power to apportion state revenues among the several political subdivisions.

Haw. Const. art. VIII, § 3 (1978) (emphasis added). Contemporaneously, revisions were made to article XVIII to ensure an orderly transition of the power to tax real property. Specifically, the 1978 Constitution provided that,

*for a period of eleven years* following ... ratification [which occurred on November 7, 1978], *the policies and methods of assessing real property taxes shall be uniform* throughout the State and shall be established by agreement of a majority of the political subdivisions. Each political subdivision shall enact such uniform policies and methods of assessment by ordinance before the effective date of this amendment [July 1, 1981], and in the event the political subdivisions fail to enact such ordinances, the uniform policies and methods of assessment shall be established by general law. Any amendments to the uniform policies and methods of assessment

established by the political subdivisions may only be made by agreement of a majority of the political subdivisions and enactment thereof by ordinance in each political subdivision.

*Real property tax exemptions ... as provided by law and in effect upon ratification ... shall be enacted by ordinance and shall not be eliminated or diminished for a period of eleven years* following such ratification; provided that increases in such exemptions, or the additions of new and further exemptions or dedications of lands, may be established or granted only by agreement of a majority of the political subdivisions, and such increases or additions shall be enacted by ordinance in each political subdivision.

Haw. Const. art. XVIII, § 6 (1978) (emphases added). In response to these constitutional amendments, the legislature, in 1980, enacted HRS Chapter 246A with the stated purpose of "provid[ing] for the orderly transfer of these functions, powers, and duties, including the transfer of personnel, records, and equipment to the counties." 1980 Haw. Sess. L. Act 279, § 1 at 534 (presently codified as HRS § 246A-1 (1993)). The statute, enacted under the authority of article XVIII, section 6, reiterated the eleven-year proscription against repealing or diminishing real property tax exemptions that were in force prior to the transfer of real property taxation powers to the counties. *See* HRS § 246A-2 (1993).[3]

3. HRS § 246A-2 provides in relevant part as follows:

[T]he functions, powers, duties, and authority heretofore exercised by the department of taxation relating to the taxation of real property shall be exercised by the respective counties, except the County of Kalawao, as provided by Article VIII, Section 3, of the State Constitution:

(1) For a period of eleven years commencing November 7, 1978, the counties shall, by majority agreement of the counties, provide for uniform policies and methods of assessment for the taxation of all real property throughout the State. Such policies and methods shall include but not be limited to the assessment, levy, and collection·of real property taxes.... In the event the counties cannot agree as to what shall be the uniform policy and method of assessment or should any or all of the counties fail to enact such

ordinance[,] the legislature shall by general law provide for a uniform method of assessment of real property taxes throughout the State....

(2) Each county shall enact by ordinance and adopt as law for the county all of the real property tax exemptions ... as now provided by law. These exemptions and dedications shall continue undiminished for a period of eleven years commencing November 7, 1978. The counties may by majority agreement of the counties and subsequent enactment by ordinance enlarge, add to, increase, or provide for new exemptions.... The enlargement, addition to, or creation of new exemptions ... may be amended by majority agreement of all the counties and subsequent enactment thereof by ordinance; provided that any such amendment shall not in any way diminish the exemption ... that was in force on November 7, 1978; and

Among the exemptions recognized by the State at the time the constitutional amendments were enacted was one involving "[r]eal property under lease to the State or any county under which lease the lessee is required to pay the taxes upon such property"[4] [hereinafter, the Exemption]. HRS § 246-36(2) (1993). The County subsequently adopted the Exemption when it enacted Revised Ordinances of Honolulu (ROH) § 8-10.17(2) (Supp.1981),[5] which contains language virtually identical to that of the statute. It is uncontested that the County complied with the constitutional and statutory mandate during the eleven-year period following the transfer of the taxing authority.

On September 9, 1993, however, a complaint was filed in United States District Court for the District of Hawai'i that would eventually lead to the repeal of the Exemption and the filing of the present lawsuit. In *United States v. City and County of Honolulu*, Civ. No. 93-00715 ACK, the United States sought, *inter alia*, a declaratory judgment that the Constitution of the United States prohibited the County from assessing and collecting taxes on property leased to the United States under terms requiring the United States to pay real property taxes as additional rent. The gravamen of the United States' complaint was that such taxation was unconstitutional because the County had exempted privately-owned property leased un-

der similar terms to the State and County without extending the Exemption to the United States. The case was ultimately settled and a stipulated judgment was filed on August 22, 1994. Under its terms, the settlement did not operate as an admission by the County that ROH § 8-10.17(b) was unconstitutional. However, the County agreed not to impose a tax on property leased to the United States "as long as the above-cited ordinance section remain[ed] in force and effect, and as long as the leases involved remain[ed] unchanged and in force and effect."

Soon thereafter, in 1994, the County adopted an ordinance the stated purpose of which was "to repeal the exemption currently provided to privately owned properties that are leased to the state or county." Bill No. 64 was signed by Mayor Jeremy Harris in 1995, enacted as Ordinance 95-67, and became effective on July 1, 1996.

The 1996 Legislature responded by passing Act 227, which purported to amend HRS Chapter 246A with the addition of the following language: "Notwithstanding any other provisions of this chapter, the counties shall not diminish or repeal the exemption existing on November 1, 1989, for real property under lease to the State under which lease the lessee is required to pay the taxes on the property." 1996 Haw. Sess. L. Act 227, § 1,

---

(3) Each of the counties, with the exception of the county of Kalawao, shall succeed to all of the rights and powers previously exercised, and all of the duties and obligations incurred by the department of taxation in the exercise of the functions, powers, duties, and authority transferred, whether such functions, powers, duties, and authority are mentioned in or granted by any law, contract, or other document.... Each county shall have the power to determine real property tax rates by resolution under procedures defined in the real property tax ordinance of the county. All references in any such law ... to the department of taxation[,] such as dedication agreements, collection and payment agreements, or exemptions, shall apply to the respective counties, as if each of the respective counties, with the exception of the county of Kalawao, were specifically named in such law, contract, or document in place of the department of taxation.

4. In a declaration attached to the State's motion for partial summary judgment, Ivan Nishiki, the Leasing Branch Chief of the Department of Ac-

counting and General Services (DAGS) of the State of Hawai'i, averred that

[l]eases negotiated by DAGS on behalf of the State generally contain a provision like the following:
*Real Property Tax.* Lessee [the State] shall be liable for its pro rata share of real property taxes to be paid as part of operating costs and utilities. However, the Lessee will file for and may obtain an exemption from real property taxes under [HRS] § 246-36(2), and upon granting the exemption, neither the pro rata share nor the real property taxes of others shall be actually assessed to or collected against the Lessee in any form. Said exemption shall effectively reduce Lessee's pro rata share of the operating costs and utilities.

5. ROH § 8-10.17(2) was subsequently recodified as ROH § 8-10.17(b) (1990) before being repealed, as discussed *infra*.

at 516, *and later codified as* HRS § 246A–2(2) (Supp.1996). Act 227, which was approved by the Governor on June 17, 1996, included a sunset clause providing that the amendment was to be repealed one year after its enactment. *Id.* at 517. According to the State, "[t]he purpose of the Act was to provide a one year grace period from the assessment of such taxes by the counties in recognition of the State's serious financial constraints, and also to allow the Legislature to properly budget for payment of property taxes in the next biennium."

The County disregarded the new legislation. Beginning with the 1996–97 tax year, real property taxes were assessed and collected from owners of property leased to the State, even in cases where the lease provided that the State would be responsible for the ultimate payment of the tax assessment. The State, however, has failed to pay any real property taxes on properties leased to it for the 1996–97 tax year. Consequently, the lessors, who had previously benefitted from the Exemption, began demanding that the State respect its contractual obligations and threatened to evict State agencies from leased premises because of the State's delinquency.

On January 12, 1998, the State filed the instant lawsuit, alleging that: (1) the doctrine of sovereign immunity precluded the County from assessing real property taxes against the State; (2) the County was acting in violation of HRS § 246A–2; and (3) irreparable injury would result, if the County were allowed to continue disregarding the Exemption. In its prayer for relief, the State requested that the County be enjoined, generally, "from assessing and collecting any real property tax on real properties leased to the State under the doctrine of sovereign immunity" and, specifically, that the County be enjoined from collecting such taxes for the 1996–97 tax year in disregard of HRS § 246A–2. Along with its complaint, the State also filed a motion seeking to preliminarily enjoin the County from assessing and collecting the taxes pending the final out-

come of the case. The motion for preliminary injunction was denied, subsequent to a hearing, by the Honorable Steven M. Nakashima on April 6, 1998. On September 29, 1998, the court filed a notice of proposed dismissal because no pretrial statement had been filed within eight months after the filing of the complaint. The State objected to dismissal of the case and informed the court that it had discussed the possibility of a global resolution of tax issues with the County and that it intended to engage in settlement negotiations. On November 16, 1998, the court filed an order withdrawing its notice of proposed dismissal, and the State thereafter filed its pretrial statement on November 24, 1998. The record contains no indication as to what transpired for the duration of 1999.

On April 3, 2000, the State filed a motion for partial summary judgment, contending that there were no genuine issues of material fact and that, as a matter of law, the County should be permanently enjoined from disregarding the Exemption and ordered to "refund to [the State] or to [the State's] landlords, as the case may be, property taxes previously paid by them in violation of the law." In support of its motion, the State again asserted that, independent of the existence of Act 227, the County's taxation of real property leased by the State was in violation of the doctrine of sovereign immunity. The State argued that its leaseholds were equivalent to state-owned property and that, therefore, they could not be taxed absent an express waiver of immunity from taxation. The State contended that the constitutional amendment transferring the exclusive power to tax real property to the County was, at best, an implied waiver and, hence, insufficient to legitimize the taxation of privately-owned property leased to the State.

The State also addressed the validity of Act 227, arguing that, pursuant to article VIII, section 6 of the Hawai'i Constitution,[6] the grant of home rule and real property taxation powers to the counties did not limit

---

**6.** Article VIII, section 6 provides, "[T]his article shall not limit the power of the legislature to enact laws of statewide concern."

the legislature's authority to address matters of statewide concern. The State urged the court to conclude that Act 227 was a valid enactment that addressed a matter of statewide concern and, therefore, preempted the County tax ordinance that had repealed the Exemption. Consequently, the State maintained that the County should be ordered to refund any real property taxes assessed and collected in violation of Act 227. Exhibits attached to the State's motion highlighted the existence of numerous contracts between the State and private lessors, the terms of which obligated the State for hundreds of thousands of dollars in real property taxes for the 1996–97 tax year.[7] Moreover, the State made clear that it would ultimately seek refunds for *all* real property taxes assessed against its lessors, even though Act 227 applied only to the tax year 1996–97 because "[t]he imposition of the real property tax against the State continues to divert State funds to the [County] in violation of the State's immunity[.]" The State alleged that the County's taxation of state-leased properties cost the State approximately $2 million per year.

The County opposed the motion for partial summary judgment, contending that the State was merely recycling the unsuccessful arguments it had advanced two years earlier in its motion for a preliminary injunction. The County also challenged the court's jurisdiction, arguing that, because the real property tax was being assessed against a private landowner, the State lacked standing to prosecute the action. In addition, the County claimed that, in light of the delegation of real property taxing authority to the counties, Act 227 was enacted illegally. Finally, the County urged the court to reject the State's arguments and enter summary judgment in its favor.

7. The exhibits did not purport to represent the totality of contested tax payments made by the State or the States' lessors in the 1996–97 tax year. The State contended, however, that the declaration by Mr. Nishiki and the included exhibits were sufficient to justify summary judgment and refunds to those lessors who had been identified as having paid specific amounts under the terms of a lease to the State. The State styled its motion as one for "partial" summary

A hearing on the motion, presided over by the Honorable Gail C. Nakatani, was held on April 3, 2000. During the course of the proceedings, the County conceded that it did not dispute the notion that the sovereign immunity doctrine barred county taxation of state-owned property. The State conceded that it could point to no authority holding that the doctrine of sovereign immunity barred taxation of private individuals leasing property to the State. The State, however, contended that "there [wa]s no substantial distinction between the [County] imposing the tax directly on the State and imposing the tax on ... the private landlord, who simply stands there disinterested in the subject because [the terms of the lease ensure that] its lessee has to pay the tax[.]" The court attempted to ascertain the scope of the State's position regarding its immunity from County taxation, prompting the following exchange:

THE COURT: So is it ... your position that every time the [S]tate is a lessee that the [C]ounty then is prohibited from imposing a real property tax?

[State]: That's correct, Your Honor.

THE COURT: Even in a situation ... where the State is not obligated to pay tax directly but pays a higher rent in every case?

[State]: In every case where the State ends up paying the impost, the real property taxes, whether it be in a clause that passes on real property taxes[.]

THE COURT: Suppose there's no clause?

[State]: If there's no clause, then the State is not liable for paying real property taxes and maybe it's in the rent, but there's no way of proving that. And so under those circumstances I would say if ... the State and the landlord have not provided in the lease that the State has to pay the real property tax, there would be a lack of proof that the State is in fact being assessed real property tax[.]

THE COURT: Doesn't that ... give the State ... unusual powers over this issue then? I mean ... you would always put some sort of tax language in there to avoid pay[ing.]

judgment because it assumed that any additional payments would require the State "to establish, among other things, the tax component of the CAM expense (common area maintenance charge) and to provide documentation proving taxes that were paid to [the County] for which the State is liable." The State assumed that such additional matters would "be resolved by agreement of the parties or at trial, should that be necessary."

[State]: Well, it's not an unusual power. I think . . . it's a power that recognizes the sovereignty of . . . the state government. Sovereign immunity is . . . not at all unusual.

At the close of the hearing, the court determined that the State had standing, but orally denied the State's motion for partial summary judgment and granted summary judgment in favor of the County, which was subsequently memorialized in a written order filed on May 25, 2000. The written order reflected the conclusions reached by the court at the hearing on the motion:

(1) sovereign immunity is inapplicable to the assessment of real property tax against State leaseholds because the fee owner is primarily liable for such tax; and (2) Act 227 of the Session Laws of Hawai'i of 1996, which required the counties to exempt State-leased property from real property tax during the tax year 1996–97 is invalid because Article VIII, § 3, of the Hawai'i Constitution transferred all real property tax powers to the counties; that delegation of authority, being specific, overrides the general language of Article VIII, § 6, under which the legislature retained the power to enact laws of statewide concern.

Final judgment in favor of the County was entered on June 5, 2000, and this timely appeal followed.[8]

## II. *STANDARDS OF REVIEW*

### A. *Motions for Summary Judgment*

■ This court reviews the grant or denial of summary judgment *de novo*, using the same standard applied by the circuit court. *Bitney v. Honolulu Police Dept.*, 96 Hawai'i 243, 250, 30 P.3d 257, 264 (2001). "[A] court may enter judgment for the non-moving party on a motion for summary judgment where there is no genuine issue of material fact and the non-moving party is entitled to judgment as a matter of law." *Konno v. County of Hawai'i*, 85 Hawai'i 61, 76, 937 P.2d 397, 412

(1997) (citing *Flint v. MacKenzie*, 53 Haw. 672, 672–73, 501 P.2d 357, 357–58 (1972) (per curiam)).

### B. *Questions of Constitutional Law*

■ This court reviews questions of constitutional law *de novo*, under the "right/ wrong" standard and, thus, exercises its own independent constitutional judgment, based on the facts of the case. *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations omitted). Moreover, it is well-settled that, with the exception of statutes that classify on the basis of suspect categories, this court has "consistently held . . . that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. . . . [T]he infraction should be plain, clear, manifest, and unmistakable." *State v. Lee*, 75 Haw. 80, 91–92, 856 P.2d 1246, 1253–54 (quoting *Blair v. Cayetano*, 73 Haw. 536, 541–42, 836 P.2d 1066, 1069 (1992)).

## III. *DISCUSSION*

■ Preliminarily, we believe it is necessary to point out that the parties' repeated references to the "doctrine of sovereign immunity" are misleading. The doctrine of sovereign immunity refers to the general rule, incorporated in the Eleventh Amendment to the United States Constitution,[9] that a state cannot be sued in federal court without its consent or an express waiver of its immunity. U.S. Const. amend. XI. The doctrine of sovereign immunity, as it has developed in Hawai'i, also precludes such suits in state courts. *See Pele Defense Fund. v. Paty*, 73 Haw. 578, 606–607, 837 P.2d 1247, 1264–65 (1992); *W.H. Greenwell, Ltd. v. Department of Land and Natural Resources*, 50 Haw. 207, 208, 436 P.2d 527, 528 (1968). However, because this case deals with a suit initiated

---

**8.** The State filed its appeal prematurely on April 27, 2000. Pursuant to Hawai'i Rules of Appellate Procedure Rule 4(a)(2), the notice of appeal is treated as filed immediately after judgment was entered on June 5, 2000 and is, therefore, timely.

**9.** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects to any Foreign State." U.S. Const. amend. XI.

by the State, the doctrine of sovereign immunity is unavailing and inapposite.

As evinced by the claims as described, the arguments advanced, and the authorities relied on by the parties, it is clear that the immunity claimed by the State is not premised on the "doctrine of sovereign immunity" embodied in the eleventh amendment, but on principles first articulated by Chief Justice John Marshall in *McCulloch v. Maryland*, 17 U.S.(4 Wheat.) 316, 4 L.Ed. 579 (1819), discussed *infra*, and subsequently referred to as "the constitutional rule of tax immunity." *See Memphis Bank & Trust Co. v. Garner*, 459 U.S. 392, 397, 103 S.Ct. 692, 74 L.Ed.2d 562 (1983). In order to minimize any ambiguity, we will refer to the parties' arguments addressing the "doctrine of sovereign immunity" by using the more appropriate label— "the constitutional rule of tax immunity" (CRTI).

Keeping this clarification in mind, we now turn to the questions presented by this appeal: (1) whether the CRTI precludes the County from taxing privately-owned property leased to the State when the State has legally obligated itself to pay the taxes; (2) whether HRS § 246–36(2) is a valid law of statewide concern that exempts State-leased property from County taxation; and (3) whether Act 227 of the 1996 Hawai'i Session Laws was enacted in violation of the Hawai'i Constitution. We address each of these questions in turn.

### A. *Constitutional Rule of Tax Immunity*

■ The State urges this court to hold that the CRTI enunciated in *McCulloch* is controlling and that the County ordinance repealing the Exemption is void because, if the "properties the State leases [are] not immune from local taxation, the State's leasing costs would increase and its ability to conduct operations would be reduced accordingly." We decline to so hold.

In *McCulloch*, the Court declared unconstitutional a tax levied by the state of Maryland against the operations of the Bank of the United States. *Id.* at 436. The tax in question required the Bank of the United States to pay a fixed sum on every note issued or, in the alternative, a yearly lump sum for the privilege of operating within the state. *Id.* at 319–21. The Supreme Court deemed such taxation to be unconstitutional inasmuch as it ran counter to a principle that "so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it, without rending it into shreds." *Id.* at 426. This principle, as described by Chief Justice John Marshall,

> is, that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states, and cannot be controlled by them. From this, which may be almost termed an axiom, other propositions are deduced as corollaries.... These are, 1st. That a power to create implies a power to preserve: 2d. That a power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and to preserve: 3d. That where this repugnancy exists, that authority which is supreme must control, not yield to that over which it is supreme.

*Id.* Specifically addressing the legitimacy of state taxes levied against the operations of the federal government, the Court concluded:

> [T]he sovereignty of the state, in the article of taxation itself, is subordinate to, and may be controlled by the constitution of the United States. How far it has been controlled by that instrument, must be a question of construction. In making this construction, no principle, not declared, can be admissible, which would defeat the legitimate operations of a supreme government. It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence.... That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which

exerts the control, are propositions not to be denied.

*Id.* at 427–31. The Court, in deciding that the Maryland tax was unconstitutional and void, held that

> the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

*Id.* at 436. This holding was an inevitable consequence of the Court's understanding that "[a]ll subjects over which the sovereign power of a state extends[ ] are objects of taxation; but those over which it does not extend[ ] are, upon the soundest principles, exempt from taxation." *Id.* at 429.

*McCulloch* addressed vital issues concerning the balance of power between the federal government and sovereign states. *See James v. Dravo Contracting Co.*, 302 U.S. 134, 162, 58 S.Ct. 208, 82 L.Ed. 155 (1937) (Roberts, J., dissenting on other grounds, and noting that the CRTI "springs from the necessity of maintaining our dual system of government."). The Court noted that, although the federal and state governments both held valid powers stemming from the sovereignty conferred under their respective constitutions, the magnitude of the power conferred was hardly equivalent:

> The people of all the states have created the general government, and have conferred upon it the general power of taxation. The people of all the states, and the states themselves, are represented in congress, and, by their representatives, exercise this power. When they tax the chartered institutions of the states, they tax

their constituents; and these taxes must be uniform. But when a state taxes the operations of the government of the United States, it acts upon institutions created, not by their own constituents, but by people over whom they claim no control. It acts upon the measures of a government created by others as well as themselves, for the benefit of others in common with themselves. The difference is that which always exists, and always must exist, between the action of the whole on a part, and the action of a part on the whole-between the laws of a government declared to be supreme, and those of a government which, when in opposition to those laws, is not supreme.

*McCulloch*, 17 U.S. at 435–36.

■ The present case does not involve a situation where this court must decide the extent to which a county's "sovereignty" is constitutionally protected against the legislative intrusion of the "sovereign" state. *See, e.g., Hawai'i Government Employees' Ass'n v. County of Maui*, 59 Haw. 65, 576 P.2d 1029 (1978). The County's power to tax real property does not derive from the constitutional grant of home rule powers under article VIII, section 2 of the Hawai'i Constitution and is not similarly limited.[10] Rather, the people of Hawai'i, through their constitution, have conferred upon the counties the exclusive power to tax real property. In this case, unlike in *McCulloch*, there is but one constitution that must be construed. Under the terms of this constitution and with regard to the power to tax real property, it is the counties—and not the State—that have been declared supreme. To the extent that the counties, in exercising their exclusive power to tax real property, do not run afoul of the federal or state constitutions, they may act as they see fit. And, although each county's power to tax real property extends only to

---

**10.** Article VIII, section 2 provides that:

> Each political subdivision shall have the power to frame and adopt a charter for its own self-government within such limits and under such procedures as may be provided by general law. Such procedures, however, shall not require the approval of a charter by a legislative body.
>
> Charter provisions with respect to a political subdivision's executive, legislative and administrative structure and organization shall be superior to statutory provisions, subject to the authority of the legislature to enact general laws allocating and reallocating powers and functions.
>
> A law may qualify as a general law even though it is inapplicable to one or more counties by reason of the provisions of this section.

property located within its boundaries, the power itself is one granted by the people of the entire state, not the constituents of any one county. We, therefore, conclude that the reasoning of *McCulloch* is inapposite.

However, even assuming that the doctrine enunciated in *McCulloch* had some relevancy, the State's contentions would be equally unavailing. Almost two centuries have passed since the opinion in *McCulloch* was handed down. Since then, federal immunity from state taxation has been considerably narrowed. *See generally United States v. County of Fresno*, 429 U.S. 452, 459–64, 97 S.Ct. 699, 50 L.Ed.2d 683 (1977) (detailing the line of subsequent cases that have departed from the broad grant of immunity in *McCulloch*). One of the cases that marked a decided shift in the Court's position regarding federal immunity from state taxation was *Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941), which the State inexplicably cites as support for its position.

In *King & Boozer*, the Supreme Court was asked to decide "whether [an] Alabama sales tax with which the seller is chargeable, but which he is required to collect from the buyer, infringes any constitutional immunity of the United States from state taxation." *Id.* at 6–7, 62 S.Ct. 43. The federal government [hereinafter, Government] argued that, for all practical purposes, it was the purchaser of lumber bought by contractors hired to construct an army camp for the United States. *Id.* at 9–10, 62 S.Ct. 43. Under the terms of its contract, the Government "undertook to pay a fixed fee to the contractors and to reimburse them for specified expenses including their expenditures for all supplies and materials and 'state or local taxes ... which the contractor may be required on account of his contract to pay.'" *Id.* The Supreme Court, after analyzing the course of business followed in the purchase of the lumber and the relevant state statute, held that

the legal effect of the transaction ... was to obligate the contractors to pay for the lumber. The lumber was sold and delivered on order of the contractors, which stipulated that the Government should not be bound to pay for it. It was in fact paid for by the contractors, who were reimbursed by the Government pursuant to their contract with it. The contractors were thus purchasers of the lumber, within the meaning of the taxing statute, and as such were subject to the tax. They were not relieved of the liability to pay the tax either because the contractors, in a loose and general sense, were acting for the Government in purchasing the lumber or, as the Alabama Supreme Court seems to have thought, because the economic burden of the tax imposed upon the purchaser would be shifted to the Government by reason of its contract to reimburse the contractors.

*Id.* at 12, 62 S.Ct. 43. Having established that the legal incidence of the tax was not laid directly upon the Government, the Court concluded that "[t]he asserted right of the [Government] to be free of taxation by the [states] does not spell immunity from paying the added costs, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity." *Id.* at 9, 62 S.Ct. 43.

In the wake of *King & Boozer*, the Supreme Court has repeatedly emphasized that, under the CRTI first articulated in *McCulloch*, states are forbidden from imposing taxes "the legal incidence of which falls on the Federal Government." *Memphis Bank & Trust Co.*, 459 U.S. at 397, 103 S.Ct. 692 (quoting *County of Fresno*, 429 U.S. at 459, 97 S.Ct. 699). In post-*McCulloch* opinions, the Court has repeatedly underscored the necessity of distinguishing between situations in which the legal incidence of a tax falls upon the Government and situations in which the Government is economically burdened by the operation of a local tax. *Id.* (citing *County of Fresno*, 429 U.S. at 459–64, 97 S.Ct. 699; *United States v. City of Detroit*, 355 U.S. 466, 473, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); *Werner Machine Co., Inc. v. Director of Div. of Taxation*, 350 U.S. 492, 76 S.Ct. 534, 100 L.Ed. 634 (1956); *Tradesmens Nat'l Bank of Oklahoma v. Oklahoma Tax Comm'n*, 309 U.S. 560, 564, 60 S.Ct. 688, 84 L.Ed. 947 (1940)). As the Court has plainly stated, "immunity may not be conferred simply because the tax has an effect on the United States, or even because

the Federal Government shoulders the entire economic burden of the levy[.]" *United States v. New Mexico*, 455 U.S. 720, 734, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982).

With respect to the disputed taxes in this case, it is clear that, as a general matter, the legal incidence of taxation falls on the owner of the real property assessed. ROH § 8–6.3(a) (1990) provides that "[r]eal property shall be assessed in its entirety to the owner thereof[.]" Although the ordinance also provides for situations in which "the real property shall be assessed in its entirety to a lessee[,]" *id.*, the State has not argued that any such situation exists with respect to its own leases. Simply put, the State's legal *obligation* to pay the real property taxes of its lessors—an obligation the State voluntarily assumed—is not equivalent to the legal *incidence* of taxation as imposed by the County. For this reason, the State's reliance on *King & Boozer* is misplaced.[11] Therefore, we hold that the CRTI does not operate to immunize the State from the contractual obligations it has voluntarily assumed through its leases.

### B. *Statutory Immunity From Real Property Taxation*

The State contends that: (1) HRS § 246–36(2) is a valid legislative enactment that generally precludes the County from taxing the leaseholds; and (2) Act 227 is a valid legislative enactment that exempts the State from an obligation to pay the real property taxes assessed against State-leased property for the 1996–97 tax year. The County, on the other hand, argues that HRS § 246–36(2) is no longer controlling and that Act 227 was invalid at its inception.

In assessing the validity of these legislative enactments, we believe it is necessary to first examine the 1978 constitutional amendments that transferred "all functions, powers and duties relating to taxation of real property" to the counties. Haw. Const. art. VIII, § 3. In doing so, we adhere to this court's well-established rules of construction:

> The fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it. This intent is to be found in the instrument itself. When the text of a constitutional provision is not ambiguous, the court, in construing it, is not at liberty to search for its meaning beyond the instrument. However, if the text is ambiguous, extrinsic aids may be examined to determine the intent of the framers and the people adopting the proposed amendment.

*State v. Kahlbaun*, 64 Haw. 197, 201–02, 638 P.2d 309, 314 (1981).

The plain language of the constitutional provision at issue clearly indicates an intent to confer exclusive authority over real property taxation to the counties. This court has addressed the 1978 constitutional amendments in earlier cases that are relevant to the issues raised by the State. In *Gardens at West Maui Vacation Club v. County of Maui* [hereinafter, *Gardens* ], 90 Hawai'i 334, 978 P.2d 772 (1999), this court held that "[a]rticle VIII, section 3 was expressly and manifestly designed to transfer to the counties broad powers of real property taxation." *Id.* at 341, 978 P.2d at 779. This court has observed that "the purpose of the amendment was to place the burden of the real property taxation system at the county level[,]" *id.*, and that the constitutional amendment, along with the legislative enactments

<hr/>

**11.** The State's reliance on *Commonwealth v. Dauphin County*, 335 Pa. 177, 6 A.2d 870 (1939), and similar cases is equally misplaced. In *Dauphin County*, the Pennsylvania Supreme Court was asked to decide whether a municipal subdivision could properly tax Commonwealth property. *Id.* at 871. The Pennsylvania court answered the question in the negative, holding that, absent an explicit designation in the statute conferring taxation authority to municipal subdivisions, the power to tax state property could not be implied. *Id.* at 872. We note, however, that Pennsylvania's Constitution specifically entrusted

to the state legislature the power to determine what real property would be subject to taxation and what would be immune. *Id.* at 871–72. If municipal subdivisions had any authority to determine real property taxation, it was limited exclusively to the powers specifically delegated by the legislature. *Id.* As stated previously and discussed *infra*, the Hawai'i Constitution provides otherwise, thus rendering inapposite any analogy to *Dauphin County* or cases from jurisdictions controlled by constitutional provisions unlike our own.

contained in HRS Chapter 246A providing for the orderly transfer of property taxation power to the counties, "covered the whole subject . . . and embraced the entire law in that regard." *Id.*

Gardens involved a challenge to the counties' power to establish differential tax rates. *Id.* at 340, 978 P.2d at 778. In that case, the plaintiffs contended that, the constitutional amendment and HRS Chapter 246A notwithstanding, the existence of HRS § 248–2, a state statute requiring a state-wide single rate of tax, precluded the counties from creating classifications of property and taxing them at differential rates. *Id.* The court in *Gardens* held that the legislative enactments implementing the constitutional amendments had the effect of superceding the earlier statute and that HRS § 248–2 had been repealed by implication. *Id.* at 341–42, 978 P.2d at 780.

In *Weinberg v. City and County of Honolulu*, 82 Hawai'i 317, 922 P.2d 371 (1996), the plaintiff argued that the transfer of all functions, powers, and duties to the counties did not operate to relieve the counties of their duty to continue assessing real property under the methods detailed in HRS § 246–10(f)(1). *Id.* at 323–24, 922 P.2d at 377–78. The plaintiff's argument was premised on his interpretation of HRS § 246A–2(3) (1993), which provided that, in their exercise of real property taxation powers, the counties would succeed to the duties and obligations previously incurred by the State Department of Taxation. *Id.* at 323, 922 P.2d at 377. This court disagreed and concluded that the plaintiff's argument was untenable, reasoning that:

> The purpose of HRS Chapter 246A was "to provide for the orderly transfer of [real property taxation] functions, powers, and duties, . . . to the counties." HRS § 246A–1. HRS §§ 246A–2(1) and 246A–2(2) generally describe an eleven-year transition period during which the counties, by majority agreement among themselves, were to adopt ordinances to "provide for uniform policies and methods of assessment for the taxation of all real property throughout the state." Each county was also to "enact by ordinance and adopt as law for the county all of the real property tax exemptions . . . as now provided by law." By their own terms, HRS §§ 246A–2(1) and 246A–2(2) lapsed after a period of eleven years, in November 1989. Adoption of Weinberg's interpretation of HRS § 246A 2(3)—that the counties are still bound by the same assessment methods that were imposed on the State Department of Taxation—would render the provision of an eleven-year transition period meaningless because HRS chapter 246, rather than county ordinances, would continue to govern the policies and methods of assessment.

*Id.* at 324, 922 P.2d at 378. In *Weinberg*, this court held that, "to the extent that there is any conflict between HRS § 246–10(f)(1) and ROH § 8.7–1(a), it is the ordinance, and not the statute, that is controlling." *Id.*

 In the present case, the State maintains that HRS § 246–36(2), a statute that preexisted the 1978 constitutional amendment, continues to retain its validity despite the subsequent enactment of a County ordinance expressly repealing the Exemption created by the statute. The State seeks to persuade this court that the statute's express creation of an exemption and the ordinance's express repeal of the very same exemption does not represent a genuine conflict, thereby obviating the need to find that the ordinance is controlling. The State argues that the measures actually "overlap insofar as they both deal with real property taxation, but full effect can be given to both because section 246–36(2) deals with matters of statewide concern that are reserved to the legislature under [a]rticle VIII, [section] 6 of the Hawai'i Constitution." We are unpersuaded and conclude that this argument is as untenable as that presented by the plaintiff in *Weinberg*.

Just as HRS § 246A–2(1) required the counties to maintain uniform policies and methods of assessment for a period of eleven years, HRS § 246A–2(2) temporarily limited the counties' ability to repeal or diminish real property tax exemptions existing under state law. This statutory restriction on the counties' exclusive authority over real property taxation was valid insofar as it merely codi-

fied the language of article XVIII, section 6 of the Hawai'i Constitution. Any such restriction, however, became constitutionally impermissible at the expiration of the eleven-year period mandated by the Constitution and the legislative enactments implementing the 1978 amendments. We, therefore, hold that, as applied to these facts, HRS § 246A–2 lapsed by its own terms and by the terms of article XVIII, section 6 of the Constitution. For analogous reasons, we conclude that HRS § 246–36(2) is no longer controlling in light of the County's enactment of Ordinance 95–67.

Simply put, the Constitution obligated the County to maintain the Exemption for eleven years, after which period the County was free to exercise its exclusive authority to increase, diminish, enact, or repeal any exemptions involving real property taxes without interference by the legislature. To argue, as the State does, that the Exemption is a matter of statewide concern is to ignore the fact that the framers of the amendment clearly understood real property taxation powers, including the power to create or repeal exemptions, as matters of local concern. Although this understanding is not revealed in the plain language of the constitutional provision, this court may resort to extrinsic aids to glean the framers' intent. *Kahlbaun*, 64 Haw. at 201–02, 638 P.2d at 314. The Proceedings of the Constitutional Convention of Hawai'i of 1978 repeatedly underscore the understanding that the power to tax real property encompassed matters of strictly local concern and that this power included the power to grant or repeal exemptions from real property taxation. For example, the Standing Committee on Taxation and Finance reasoned that the power to levy a tax on real property should be granted to the counties because, *inter alia*, "[c]ounty governments are completely responsible and accountable for the administration of their local affairs" and "[t]here are certain program elements which do not invoke issues of statewide concern and/or which do not lend themselves to single, statewide solutions. In other words, there are different economic bases and needs of the counties which cannot be addressed by statewide real property provisions." 1 Proceedings of the Constitutional

Convention of Hawai'i of 1978, at 594–95 (1980). The Committee of the Whole Reports also clarify the framers' understanding that the counties would have the exclusive authority to create or repeal exemptions, even if, in exercising this prerogative, the State might lose the advantage of existing exemptions. Specifically, the Committee of the Whole noted that it had changed the language of the proposed amendment

> to include the phrase "all functions, powers and duties relating to the taxation of real property" in order to clarify the standing committee's intent to grant all taxing powers relating to real property to the counties, except Kalawao. There was some question under the earlier language as to whether or not the counties would have the power to set exemptions. Although the mover of this amendment explained that the "power to levy" did include the lesser power of setting exemptions, this amendment was adopted as having the better language.

*Id.* at 1008. Furthermore, the Committee

> rejected an amendment to return this section to its original language which rests all taxing powers with the State. Some members argued that this section should not be capriciously tampered with in light of the social policies already set forth by the State through its enactment of exemptions. Other members pointed out that the trend is toward more home rule and that the county governments want to take on more responsibility. That branch of government that is responsible for running certain affairs should have the responsibility and right to collect revenues. It is anticipated that county councils, with their daily contact with constituents, will be more responsive. Members concluded that exemptions for a particular group or groups should not determine who has this power. In any event, there is no guarantee that the State will continue to retain the same exemptions.

*Id.* at 1008–09. Accordingly, we hold that the power to set exemptions from real property taxation is not a matter of statewide concern reserved to the legislature under

522

article VIII, section 6 of the Hawai'i Constitution.

## C. *Constitutionality of Act 227*

■ Finally, we must affirm the circuit court's conclusion that Act 227 was unconstitutional. As the aforementioned reasoning thus far has made clear, any statutory restrictions on the County's powers to create or repeal real property tax exemptions ceased to have any validity at the conclusion of the constitutionally prescribed eleven-year period specified in article XVIII, section 6. Act 227, in its simplest terms, attempted to extend that period in the absence of any constitutional authority. Any such attempt must inevitably fail because it is beyond the power of the legislature to amend the Hawai'i Constitution merely through the enactment of a state law. *See* Haw. Const. art. XVII, § 3.[12]

## IV. *CONCLUSION*

Based on the foregoing discussion, we affirm the circuit court's May 25, 2000 order denying the State's motion for partial summary judgment and granting summary judgment to the County, as well as the June 5, 2000 Final Judgment.

---

**12.** Article XVII, section 3 of the Hawai'i Constitution "sets forth the procedure by which the legislature may propose amendments to the State Constitution," *Blair*, 73 Haw. at 543, 836 P.2d at 1070, and provides that:

> The legislature may propose amendments to the constitution by adopting the same, in the manner required for legislation, by a two-thirds vote of each house on final reading at any session, after either or both houses shall have given the governor at least ten days' written notice of the final form of the proposed amendment, or, with or without such notice, by a majority vote of each house on final reading at each of two successive sessions.

> Upon such adoption, the proposed amendments shall be entered upon the journals, with the ayes and noes, and published once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such a newspaper is published, within the two months' period immediately preceding the next general election.

> At such general election[,] the proposed amendments shall be submitted to the electorate for approval or rejection upon a separate ballot.

> The conditions of and requirements for ratification of such proposed amendments shall be the same as provided in section 2 of this article for ratification at a general election.