187 P.3d 580

Bang Ja GUAJARDO and Richard Guajardo, Plaintiffs–Appellants/Cross–Appellees–Petitioners,

v.

AIG HAWAI'I INSURANCE COMPANY, INC., Defendant–Appellee/Cross–appellant–Respondent.

No. 27893.

Supreme Court of Hawai'i.

July 8, 2008.

Ian L. Mattoch and Daniel P. Kirley, Honolulu, for the plaintiffs-appellants/cross-appellees-petitioners, on the application.

Jonathan H. Steiner and R. John Seibert, Honolulu, for the defendant-appellee/cross-appellant-respondent, on the opposition to the application.

MOON, C.J., LEVINSON, NAKAYAMA, AND DUFFY, JJ., and ACOBA, J., concurring separately.

Opinion of the Court by LEVINSON, J.

On February 11, 2008, the plaintiffs-appellants/cross-appellees-petitioners Bang Ja Guajardo (Mrs. Guajardo) and Richard Guajardo (Mr. Guajardo) (collectively, the Guajardos) filed an application for a writ of certiorari, urging this court to review the summary disposition order (SDO) of the Intermediate Court of Appeals (ICA) in *Guajardo v. AIG Hawai'i Insurance Co.*, No. 27893, 116 Hawai'i 72, 169 P.3d 1024, 2007 WL 3122676 (Hawai'i Ct.App. Oct. 25, 2007). They argue that the ICA gravely erred in concluding (1) that the defendant-appellee/cross-appellant-respondent AIG Hawai'i Insurance Company, Inc. (AIG) did not definitely deny the Guajardos' request for consent to their settlement with the third-party tortfeasor, Gary Senaga (Senaga), who injured Mrs. Guajardo, (2) that the first circuit court, the Honorable Bert I. Ayabe presiding, correctly ruled that AIG did not misrepresent the terms of its insurance policy to them in response to their claim for underinsured motorist (UIM) benefits, (3) that, even if AIG misrepresented the terms of the policy, the misrepresentation did not prejudice the Guajardos, (4) that AIG was not subject to a duty to conduct an independent investigation into Senaga's assets, (5) that the circuit court correctly granted summary judgment in favor of AIG, because the ICA misstated the standard of review of summary judgments and because the reasonableness of AIG's handling of the Guajardos' claim remains a genuine issue of material fact, and (6) that the circuit court correctly declined to grant the Guajardos' request to conduct further discovery pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 56(f).[1]

We hold that the ICA erred in affirming the circuit court's grant of partial summary judgment in AIG's favor and against the Guajardos with respect to the Guajardos' bad faith claim and in concluding, as a matter of law, that any unreasonable interpretation of the Guajardos' policy by AIG did not preju-

---

1. HRCP Rule 56(f) provides in relevant part:
 Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

dice them. Accordingly, we vacate the circuit court's judgment and remand this case to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

On May 23, 2002, Mrs. Guajardo was crossing Channel Street near its intersection with Ala Moana Boulevard when she was struck by a van driven by Senaga. As a result of the accident, Mrs. Guajardo suffered a "severe lower extremity injury." On the date of the injury, the Guajardos were insured for $100,000.00 in UIM coverage through AIG, and Senaga was insured for $100,000.00 in liability coverage through Progressive Insurance Company (Progressive).

On July 29, 2003, Mrs. Guajardo's counsel, Ian L. Mattoch, wrote to AIG's litigation manager, Jeffrey Ross, advising Ross of Mrs. Guajardo's intention to make a UIM claim against her AIG automotive insurance policy. Mattoch stated that Senaga possessed $100,000.00 in bodily injury liability (BI) coverage with Progressive and noted that Progressive anticipated tendering the full $100,000.00 in liability coverage. The letter advised Ross that, although Senaga was an attorney, he was also divorced, living with his parents, and without any major assets. The letter also requested that AIG determine whether it would consent to the underlying BI settlement.

On the following day, July 30, 2003, Ross responded thusly:

Thank you for your letter dated July 29, 2003. Pursuant to your request we have established a claim file for your client's UIM claim.... Nevertheless we are unable to give our consent for your client to settle her BI claim with ... Senaga's insurance carrier. As you have indicated in your letter ... Senaga is a deputy attorney general living at home with his parents. He certainly earns a good salary and has limited living expenses. On that basis we will not consent to the BI settlement since even though he may not have tangible assets he certainly has future in-

come to pay any excess judgement against him.

If you[r] client desires to make a UIM claim it will be necessary for her to obtain judgment against ... Senaga to protect our subrogation rights as required under her policy. I should advise you [that] this issue has come up several times in the past on other cases and is making its way to the Hawai['ji Supreme Court. At some point they will set the standard by which consent must be given to settle a BI claim. Right now we only have *Taylor v. GEICO*[, 90 Hawai'i 302, 978 P.2d 740 (1999),] as the case law on this subject and the Hawai['ji Supreme Court has clearly recognized a carrier's right to protect its subrogation.

On July 31, 2003, Mattoch wrote to Ross informing him that Mrs. Guajardo had sent an assets questionnaire to Senaga. He added that, "[o]bviously, AIG's present position prevents Mrs. Guajardo from doing anything to resolve the third-party claim and to pursue her claim for first-party BI insurance." As an alternative, Mattoch proposed that AIG could "buy" the BI claim, and he concluded by emphasizing that "[Mrs. Guajardo] did not pay her UIM premium to be saddled with AIG's collection efforts."

On August 4, 2003, Ross responded by letter to Mattoch, again suggesting that he review *Taylor* specifically for the proposition that "a policy's consent to settle provision 'perform[s] the crucial function of protecting a UIM carrier's potential subrogation interests.'" (Quoting *Taylor*, 90 Hawai'i at 310, 978 P.2d at 748.) Ross stated that he would be "more than willing" to work with Senaga through his attorney to determine the extent of his wealth, but that without those facts they could not make an informed decision regarding whether to settle the BI claim, and therefore AIG was "unable to either give or decline" its consent at that time. Finally, Ross noted that he was unaware of any case law that would require AIG to "buy" Mrs. Guajardo's claim and asserted that such an act would "severely prejudice" AIG's subrogation interests because Mrs. Guajardo would then have "absolutely no incentive to cooperate with [AIG] during the litigation against [Senaga]." On August 7, 2003, Mat-

toch wrote to Ross that, "[i]n the instance of 'buying' out my client's [BI] claim, we would happily sign an agreement pledging full cooperation during the course of litigation against [Senaga]." Mattoch added that, "when you see the answers to the [asset questionnaire] submitted by ... Senaga, you will realize that he has no *present capacity* which would justify refusal to consent to the settlement." (Emphasis in original.)

On August 13, 2003, Mattoch submitted a demand for tender of Mrs. Guajardo's UIM benefits to AIG through Ross. The letter included a description of the accident and a summary of the relevant medical care.

On August 14, 2003, Ross wrote to Mattoch and highlighted Part C of Mrs. Guajardo's policy, which reads: "We will pay under this coverage only after the limits of liability under any applicable [BI] liability bonds or policies have been exhausted by payment of judgments or settlements." Ross noted that, in light of this provision, Mrs. Guajardo's demand for UIM benefits was premature because the underlying BI claim had not settled. Ross reiterated AIG's position with regard to Senaga's earning potential, estimating that "he earns in the neighborhood of $70,000.00 to $80,000.00 per year with ... [minimal] living expenses." Ross again asserted AIG's right to protect its subrogation interest as follows:

> It was ... Senaga who made the decision to only carry $100,000.00 in [BI] coverage. For that reason AIG will not give its consent for your client to settle [Mrs. Guajardo's BI] claim. Should she release ... Senaga from any further obligations in this matter AIG will deny UIM coverage for this accident for violating the policy conditions.
>
> I would also note that despite your contentions that liability is clear the police report shows Mrs. Guajardo as jaywalking at the time of the accident. I understand her story is different than what's depicted on the police report[;] however[,] there is a question of fact as to how the accident

occurred which may have to be decided by a jury in this case.

On August 18, 2003, Mattoch sent Ross an opinion letter outlining the parties' respective positions. On August 19, 2003, Ross responded to Mattoch and claimed that, under *Taylor,* consent to settle provisions were valid in Hawai'i and that an insurance carrier had a right to protect its UIM subrogation rights.[2] Ross further noted that no Hawai'i law or case required AIG to purchase the BI claim. He concluded that, "[u]ntil the Supreme Court so rules[,] AIG will not agree to advance any money to your client which may be offered by ... Senaga's carrier."

On September 8, 2003, Mattoch wrote to Ross asking whether AIG, following the Guajardos securing a judgment against Senaga, would consent to settle, cover the costs of such action, and/or pay the Guajardos' attorney's fees. Mattoch cited *Best Place, Inc. v. Penn Am. Ins. Co.,* 82 Hawai'i 120, 920 P.2d 334 (1996), seemingly to assert that the case required AIG to take the foregoing actions if the Guajardos obtained the judgment. In a response letter of the same date, September 8, 2003, Ross notified Mattoch that AIG would not cover the expenses incurred in the action against Senaga, nor would it pay Mrs. Guajardo's attorney's fees.

On September 12, 2003, Progressive wrote to Mattoch informing him that Progressive had tendered Senaga's $100,000.00 BI liability policy. Progressive added that "[i]t is expressly understood that by tendering these limits our insured[,] ... Senaga, is released in full from any and all claims known and unknown." On the same day, Mattoch forwarded Progressive's tender offer to Ross and enclosed a report by an economist, Thomas Loudat, Ph.D., which estimated Senaga's annual residual income to be $22,084.00. Mattoch also enclosed a copy of a complaint against AIG, which he claimed would be filed unless "we receive the consent by AIG to accept the $100,000.00 tender or AIG's agreement to buy out the underlying

---

2. We note, as the Guajardos did briefly in their application, that the UIM section of the policy did not contain a consent to settle clause. We believe that this court's analysis in *Taylor,* which involved a consent to settle clause, is neverthe-

less instructive, because, as AIG correctly pointed out in its initial letter to the Guajardos, a primary consideration in *Taylor* was that an insurer is allowed to protect its subrogation rights. 90 Hawai'i at 310, 978 P.2d at 748.

third-party claim no later than ... September 16, 2003."

On September 29, 2003, AIG's counsel, Jonathan Steiner, outlined AIG's position in a fax to Mattoch that was also sent by mail to Senaga and Progressive. Steiner noted, *inter alia*, that although the court in *Lambert v. State Farm Mut. Auto. Ins. Co.*, 576 So.2d 160 (Ala.1991), and numerous courts in other jurisdictions required an insurer in AIG's position to "buy" the insured's claim, such a legal requirement was not recognized by *Taylor* or any other Hawai'i case or statute. He stated: "AIG would not withhold consent to a settlement which preserves its right of subrogation against ... Senaga. By way ... of this letter to ... Senaga and Progressive, AIG hereby proposes this as a possible solution to ... this situation." He added that, in the alternative, AIG was willing to explore other options in an effort to resolve the matter, including a possible global mediation of the BI claim, the UIM claim, and AIG's subrogation rights against Senaga.

Between October 2, 2003 and January 7, 2004, the Guajardos and AIG continued to exchange correspondence regarding their respective positions. In his January 7, 2004 fax to Steiner, Mattoch stated:

> You have advised me that AIG has declined ... [the] offer [of mediation] as there would be no guarant[ee] that mediation would be successful. Accordingly, AIG has rejected our last offer to resolve this matter and continues to insist that the Guajardos file suit against ... Senaga and pursue this claim to judgment at the Guajardos' cost, ... Senaga's insurance company's tender of his [BI] limits notwithstanding.
>
> We are now considering all options in light of the Guajardos' present financial position.

On January 7, 2004, the Guajardos executed a release of their claims against Senaga in exchange for Senaga's $100,000.00 BI liability policy limit with Progressive. On January 20, 2004, Mattoch wrote to Steiner to inform him of the Guajardos' settlement with Senaga. Mattoch also discussed the recent ruling of the circuit court of the first circuit, the Honorable Gary W.B. Chang presiding, in *Melo v. AIG*, Civil No. 02–1–0676 (1st Cir. Haw. Feb. 11, 2003), in which, in a similar UIM case involving AIG, the court applied *State Farm Fire and Cas. Co. v. Pacific Rent–All, Inc.*, 90 Hawai'i 315, 978 P.2d 753 (1999),[3] in concluding that the insured was entitled to settle the BI claim without AIG's consent because there was no consent to settle clause in the policy and that, if AIG wished to pursue its subrogation rights against the tortfeasor, it would be required to assume the responsibilities of prosecuting the BI action. Mattoch queried whether, "within the context of Judge Chang's ruling," AIG would now pay its UIM claim or, in the alternative, agree to enter into arbitration.

On January 26, 2004 Steiner responded to Mattoch by fax, declining his offer of arbitration. He asserted that "[i]t is AIG's position that, notwithstanding Judge Chang's ruling[,] ... settlement and release of all claims against ... Senaga has prejudiced AIG's subrogation rights, and for that reason, your client is not entitled to UIM benefits."

### B. *Procedural Background*

On October 1, 2003, the Guajardos filed a complaint in the first circuit court against AIG for (1) a judgment declaring that AIG had an obligation to provide them UIM benefits under their policy, (2) tortious breach of the implied covenant of good faith and fair dealing, and (3) punitive damages stemming from AIG's alleged bad faith.

---

**3.** In *Pacific Rent–All*, this court held that,

> in the context of fire and casualty insurance, if the insurer proves (1) that the tortfeasor had actual or constructive knowledge of the insurer's subrogation right of reimbursement or that the tortfeasor and insured colluded to destroy the insurer's subrogation right and (2) that the insurer's subrogation right of reimbursement is actually prejudiced by the insured's release of the tortfeasor, then the insurer may maintain a subrogation action against the tortfeasor. In other words, the insured's release of the tortfeasor will not affect the insurer's subrogation right of reimbursement when the tortfeasor acts inequitably and causes actual prejudice to the insurer.

90 Hawai'i at 330, 978 P.2d at 768.

On March 15, 2004, the Guajardos filed a motion for partial summary judgment as to the claim for declaratory relief. On July 12, 2004, AIG filed a motion for partial summary judgment as to the Guajardos' bad faith and punitive damages claims.

On October 6, 2004, the circuit court conducted a joint hearing on the two motions; by orders dated January 14, 2005, the circuit court granted both motions. In granting the Guajardos' motion, the circuit court ruled that AIG must provide the Guajardos with UIM benefits under the terms of the insurance policy. The circuit court also determined, citing *Pacific Rent–All*, that even though the Guajardos had released Senaga from all claims in their settlement, AIG's subrogation rights were not prejudiced because Senaga and Progressive were on notice of the potential subrogation rights. In granting AIG's motion, the circuit court concluded that AIG was not acting in bad faith, because it was unclear at the time whether *Pacific Rent–All* applied to the matter at hand. On March 6, 2006, the circuit court entered its final judgment. On April 18, 2006, the circuit court entered its amended final judgment.

On April 20, 2006, the Guajardos filed a notice of appeal and, in their opening brief, asserted that the circuit court erred in granting AIG's motion for partial summary judgment. On October 25, 2007, the ICA affirmed the amended final judgment of the circuit court by summary disposition order. ICA's SDO at 8. The ICA held in relevant part that (1) the circuit court did not err by finding that AIG withheld the Guajardos UIM benefits in good faith, (2) the circuit court did not err by granting AIG's motion for partial summary judgment because "the law was clear regarding the issues in AIG's motion and, hence, there was no genuine issue of material fact," and (3) the circuit court did not abuse its discretion by denying the Guajardos' request for additional time to conduct discovery. ICA's SDO at 6–7. The judgment of the ICA was entered on November 14, 2007.

On February 11, 2008, the Guajardos filed a timely application for a writ of certiorari.

## II. STANDARDS OF REVIEW

### A. Application For A Writ Of Certiorari

The acceptance or rejection of an application for a writ of certiorari is discretionary. Hawai'i Revised Statutes (HRS) § 602–59(a) (Supp.2007). In deciding whether to grant the application, this court considers whether the ICA's decision reflects "(1) [g]rave errors of law or of fact[ ] or (2) [o]bvious inconsistencies ... with [decisions] of th[is] court, federal decisions, or [the ICA's] own decision[s]" and whether "the magnitude of those errors or inconsistencies dictat[es] the need for further appeal." HRS § 602–59(b).

### B. Motion For Summary Judgment

 The grant or denial of summary judgment is reviewed *de novo. State ex. rel. Anzai v. City and County of Honolulu*, 99 Hawai'i 508, 515, 57 P.3d 433, 440 (2002); *Bitney v. Honolulu Police Dep't*, 96 Hawai'i 243, 250, 30 P.3d 257, 264 (2001).

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Kahale v. City and County of Honolulu*, 104 Hawai'i 341, 344, 90 P.3d 233, 236 (2004) (brackets and citation omitted).

### C. Interpretation Of Insurance Policies

In interpreting insurance policies, this court has stated that:

> [I]nsurers have the same rights as individuals to limit their liability and to impose whatever conditions they please on their obligation, provided they are not in contravention of statutory inhibitions or public

policy. As such, insurance policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended. Moreover, every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy.

Nevertheless, adherence to the plain language and literal meaning of insurance contract provisions is not without limitation. We have acknowledged that because insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer. Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson.

*Dairy Rd. Partners v. Island Ins. Co.*, 92 Hawai'i 398, 411–12, 992 P.2d 93, 106–07 (2000) (citations, quotation marks, and brackets omitted).

### III. *DISCUSSION*

A. *The ICA Erred In Affirming The Circuit Court's Grant Of AIG's Motion For Summary Judgment On The Grounds That There Were No Genuine Issues Of Material Fact As To Whether AIG Had Committed A Tortious Breach Of The Implied Covenant Of Good Faith And Fair Dealing.*

The Guajardos claim that the ICA gravely erred in concluding that "AIG did not misrepresent to the Guajardos that their policy required them to pursue Senaga to judgment to protect AIG's subrogation rights." ICA's SDO at 6. The relevant portions of AIG's auto insurance policy are as follows:

Part C—Underinsured Motorist Coverage (Bodily Injury Only)

We will pay compensatory damages which an *insured* is legally entitled to recover from the owner or operator of an *underinsured motor vehicle* because of *bodily injury:*

1. Sustained by an *insured;* and

2. Caused by an accident.

The owner's or operator's liability for compensatory damages must arise out of the ownership, maintenance or use of the *underinsured motor vehicle.*

We will pay under this coverage only after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted *by payment of judgments or settlements.*

. . . .

Part G—General Provisions

. . . .

OUR RIGHT TO RECOVER PAYMENT

If we make a payment under this policy and the person to or for whom payment was made has a right to recover damages from another *we shall be subrogated to that right.* That person shall do:

1. Whatever is necessary to enable us to exercise our rights; and

2. *Nothing after loss to prejudice them.*

(Some emphases added and some in original.)

The Guajardos argue that "AIG's assertion that its . . . policy required the Guajardos to pursue . . . Senaga to judgment to protect AIG's subrogation rights, in lieu of accepting a policy limits BI settlement, is a blatant falsehood because the insurance policy contains no such provision." In response, AIG claims that it correctly represented its policy because

the [policy] gave AIG the right to pursue a subrogation claim against a tortfeasor and required that [the Guajardos] do nothing to prejudice that right. Information initially provided AIG justified a good faith belief that a realistic possibility existed [that] Senaga could satisfy a . . . judgment AIG might secure were it to pay UIM benefits to [the Guajardos].

AIG also argues that it never denied the possibility of a settlement but instead, in its first response to the Guajardos, offered an "initial, non-binding decision."

The parties' arguments require construction of the policy's language to determine its meaning. This court has held that "'[i]nsurance policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended.'" *Dairy Rd.*, 92 Hawai'i at 411, 992 P.2d at 106 (quoting *First Ins. Co. of Hawai'i, Inc. v. State*, 66 Haw. 413, 423–24, 665 P.2d 648, 655 (1983))(brackets omitted). Moreover, "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy...." HRS § 431:10–237 (2005); *see also State Farm Mut. Auto. Ins. Co. v. Fermahin*, 73 Haw. 552, 556, 836 P.2d 1074, 1077 (1992); *Smith v. New England Mut. Life Ins. Co.*, 72 Haw. 531, 534, 827 P.2d 635, 636 (1992). This court does not, however, apply a mechanistic reading of insurance contracts; it has instead adhered to the proposition that, "'[b]ecause insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, ... they must be construed liberally in favor of the insured and [any] ambiguities [must be] resolved against the insurer.'" *Allstate Ins. Co. v. Ponce*, 105 Hawai'i 445, 457, 99 P.3d 96, 108 (2004) (quoting *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 67 Haw. 203, 209, 684 P.2d 960, 964 (1984)) (brackets in original) (emphasis omitted). In other words, "'the rule is that policies are to be construed in accord with the reasonable expectations of a layperson.'" *Id.* at 458, 99 P.3d 96, 99 P.3d at 109 (quoting *Sturla*, 67 Haw. at 209, 684 P.2d at 964).

A commonsense reading of the relevant parts of AIG's policy demonstrates that AIG contracted to "pay under [the UIM] coverage" once the underinsured tortfeasor's BI limits had been exhausted "by payment of judgments or settlements." Furthermore, under Part G, if AIG makes a payment under the policy to a person who "has a right to recover damages from another[, AIG] will be subrogated to that right," and that person "shall do nothing after loss to prejudice [AIG]." Thus, the question is whether the interpretation of the policy that AIG commu-

nicated to the Guajardos was unreasonable, rising to the level of bad faith.

This court has held that

there is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action. The breach of the express covenant to pay claims, however, is not the *sine qua non* for an action for breach of the implied covenant of good faith and fair dealing. *Rawlings[ v. Apodaca*, 151 Ariz. 149], 726 P.2d [565,] 573 [ (Ariz.1986) ]. "The implied covenant is breached, whether the carrier pays the claim or not, when its conduct damages the very protection or security which the insured sought to gain by buying insurance." *Id.*

*Best Place*, 82 Hawai'i at 132, 920 P.2d at 346; *see also Francis v. Lee Enters., Inc.*, 89 Hawai'i 234, 238, 971 P.2d 707, 711 (1999) ("[*Best Place* ] explained that an action for the tort of 'bad faith' will lie ... when an insurance company unreasonably handles or denies payment of a claim."). *Best Place* also held that "*conduct* based on an interpretation of the insurance contract that is *reasonable* does not constitute bad faith." 82 Hawai'i at 133, 920 P.2d at 347 (emphasis added).

In this case, we must look to AIG's "conduct" in light of its interpretation of the policy. *Id.* The first communication between Mattoch and Ross occurred by letter dated July 29, 2003, in which Mattoch notified AIG of the accident, gave a brief description of Senaga's financial situation, and requested that AIG "assign this matter for a consent to settle determination." Ross responded to Mattoch by letter dated July 30, 2003:

[W]e have established a claim file for [the Guajardos'] UIM claim.... Nevertheless, *we are unable to give our consent for your client to settle her BI claim* with ... Senaga's insurance carrier. As you have indicated in your letter ... Senaga is a deputy attorney general living at home with his parents. He *certainly* earns a good salary and has limited living expenses. *On that basis we will not consent to the BI settle-*

*ment since* even though he may not have tangible assets he *certainly* has future income to pay any excess judgment against him.

If you[r] client desires to make a UIM claim *it will be necessary for her to obtain judgment* against ... Senaga to protect our subrogation rights *as required under her policy.*

(Emphases added.)

■ We note, as a preliminary matter, that the parties disagree as to the substance of the position that AIG was intending to communicate in Ross's letter. The Guajardos claim that the ICA gravely erred when it concluded that "AIG did not definitely deny the settlement request before receiving information regarding Senaga's income and assets; rather, AIG merely withheld its consent to the settlement pending AIG's receipt of such documentation." ICA's SDO at 7. AIG argues, on the other hand, that Mattoch "clearly understood" its July 30, 2003 letter to be advancing "an initial, non-binding decision" and "an implicit request for additional information concerning ... Senaga's asset picture." AIG attempts to buttress its argument by noting that, on the following day, Mattoch advised AIG that he had prepared a financial questionnaire that he planned to serve on Senaga.

The Guajardos and their counsel do not view the July 30, 2003 letter in the same light, and neither do we. A plain reading of the letter seemingly leads to a single conclusion: AIG was unequivocally withholding its consent to settle. AIG unqualifiedly stated that it was "unable to give [its] consent" and that it "[would] not consent to the BI settlement," suggesting no steps that the Guajardos could take, other than "obtain[ing] judgment against ... Senaga," to alter AIG's position. The letter is clear that AIG's denial of consent was due to the fact that Senaga "certainly" earned a large salary and "certainly" had future income to pay any excess judgment. The letter flatly stated that "it will be necessary for [Mrs. Guajardo] to obtain judgment against Senaga" in order for her to "make a UIM claim," thereby foreclosing a settlement with Senaga that preserved

AIG's subrogation rights as an avenue to receiving the requested UIM benefits.

AIG's argument that the Guajardos understood Ross's July 30, 2003 letter as "an implicit request" for additional information exudes disingenuousness. Nothing in Ross's letter evidenced any willingness to consider any course of action other than the Guajardos pursuing Senaga to judgment. In light of AIG's pronouncement in the letter that Senaga "certainly" had future income that could satisfy an excess judgment, one is hard pressed to discern how AIG could simultaneously have been "implicitly" requesting further information about Senaga, inasmuch as AIG had already glimpsed into the future and foretold his riches. Mattoch seconded this point in his July 31, 2003 response to Ross, in which, apart from unilaterally offering to provide a sworn asset questionnaire from Senaga, he noted that, "[o]bviously, AIG's present position prevents Mrs. Guajardo from doing anything to resolve the third-party claim and to pursue her claim for first-party BI insurance.... Our client did not pay her UIM premium to be saddled with AIG's collection efforts." In light of the unequivocal language of Ross's July 30, 2003 letter, we agree with the Guajardos that the ICA erred in holding that AIG "did not definitely deny the Guajardos' settlement request before receiving information regarding Senaga's income and assets." ICA's SDO at 7. *See Black's Law Dictionary* 466 (8th ed.2004) ("denial" means "[a] refusal or rejection"). Accordingly, AIG definitively denied the Guajardos' request for consent to settle in Ross's July 30, 2003 letter.

■ The question becomes whether AIG's denial of the Guajardos' request was based on an unreasonable interpretation of its policy. *See Best Place,* 82 Hawai'i at 133, 920 P.2d at 347. Ross's July 30, 2003 letter asserted that AIG could deny consent to settle "[o]n [the] basis" that "[Senaga] certainly earns a good salary and has limited living expenses." Nothing in the UIM policy reserves AIG such a right. As stated in Part G of the policy, in making a payment to the insured, AIG becomes subrogated to any right that the policy holder may have "against another," and the insured has a

duty to "do ... [n]othing after loss to prejudice [AIG's subrogation rights]." Accordingly, the policy affords AIG a single legitimate basis for denying consent to settle, namely, the protection of its subrogation rights. In Ross's July 30, 2003 letter, AIG denied consent to settle, not because it claimed that its subrogation rights were in imminent jeopardy, a legitimate basis, but instead, essentially, because it believed that Senaga was financially secure. In that letter, and in its argument to this court, AIG invokes this court's holding in *Taylor*—which recognized the legitimacy of the objective of preserving an insurer's subrogation rights—as a talisman to ward off any impugning of its conduct. However, an imminent danger to AIG's subrogation rights was in no way implicated by Mattoch's July 29, 2003 letter, which asked only that AIG "make [its] determination in this matter by August 12, 2003." More importantly, and crucial to the question whether AIG unreasonably interpreted its insurance policy, neither *Taylor* nor AIG's own policy granted AIG the right to deny consent to settle on the basis that the tortfeasor who injured its insured had sufficient assets to allow AIG to recoup the UIM benefits owed to the insured. Whether AIG could ultimately succeed in recouping its own losses via pursuit of a legitimately preserved subrogation claim was simply irrelevant to the discharge of its duty to its insureds, namely, to consent to settlement unless its terms jeopardized AIG's prerogative to pursue subrogation, such as by purporting to release the tortfeasor from any and all future claims, which, prior to this court's holding in *Granger v. Gov't Employees Ins. Co.*, 111 Hawai'i 160, 140 P.3d 393 (2006), would have the effect of dissolving the insurer's subrogation rights. In the present case, the possibility of such a settlement was not raised until September 12, 2003, when Mattoch sent Ross a copy of Progressive's settlement offer requiring Senaga's full release from any future claims.

Ross's July 30, 2003 letter further asserted that the Guajardos UIM policy "required" them "to obtain judgment against ... Senaga." The Guajardos are correct that "the insurance policy contains no such provision." As discussed *supra*, Part C of the policy states that UIM benefits would be paid after the exhaustion of the tortfeasor's BI policy limits "by payment of judgments *or settlements*." (Emphasis added.) There is a genuine issue of material fact as to whether AIG's interpretation of its own policy was "unreasonable" because it undertook to eliminate an option that was plainly available to the Guajardos at the time and that would ostensibly do "nothing after loss to prejudice [AIG's] rights," namely, to effect a settlement with Progressive that would preserve AIG's subrogation rights.[4] AIG conceded that such an option was available, albeit two months later on September 29, 2003, when its counsel informed the Guajardos by fax that "AIG would not withhold consent to a settlement which preserves its right of subrogation against ... Senaga.... AIG hereby proposes this as a possible solution to ... this situation."

AIG's interpretation of its UIM policy as requiring the Guajardos to pursue Senaga to judgment was particularly onerous in light of its position, advanced in Ross's September 8, 2003 letter to the Guajardos, that it would not pay the Guajardos' attorney's fees even if they succeeded in obtaining the judgment against Senaga that AIG was purporting to require as a precondition to the payment of UIM benefits. In response to the Guajardos' September 8, 2003 letter suggesting that *Best Place* required AIG to foot the bill, Ross stated that he did not "recall anywhere in that decision which requires an insurer to pay an insured's attorney fees when they require an insured to obtain judgment against a negligent tortfeasor." At that time, AIG was without this court's guidance in *Granger*, which instructed that an insurer

4. The Guajardos' argument that AIG, in withholding consent to settle, was thereby required to "buy" their claim in order to protect its subrogation rights was not supported by this court's case law at the time that the motions for partial summary judgment were filed. This court subsequently validated the Guajardos' position, holding that a UIM insurer must, "within a reasonable time ..., *either* (1) consent to the proposed settlement ... *or* (2) pay [the insured] the proposed settlement amount ... and thereby assume the position of [the insured]'s subrogee." *Granger*, 111 Hawai'i at 168, 140 P.3d at 401 (emphases in original).

cannot "conscript [the insured] as its 'vicarious plaintiff' for the purpose of recovering, at substantial cost, funds that [the insured] already paid [the insurer] to bear the risk of providing in the event of an underinsured injury." 111 Hawai'i at 168, 140 P.3d at 401. Nevertheless, a requirement that the Guajardos pursue a tortfeasor to judgment in order to obtain their UIM benefits was nowhere recited in the policy and, as they have suggested in their application, plainly put the Guajardos "between the proverbial rock and a hard place."

Bearing in mind that insurance policies must be interpreted in accordance with the "reasonable expectations of a layperson," *Dairy Rd.*, 92 Hawai'i at 412, 992 P.2d at 107 (citation omitted), we hold that there is a genuine issue of material fact as to whether AIG's interpretation of its UIM policy was unreasonable, in bad faith, and in contravention of one of the legislature's stated goals for UIM insurance, *i.e.*, "providing speedy and adequate protection to persons injured in motor vehicle accidents *at the least possible cost.*" *Taylor*, 90 Hawai'i at 313 n. 10, 978 P.2d at 751 n. 10 (emphasis added).

The Guajardos assert that the ICA gravely erred when it affirmed the circuit court's entry of partial summary judgment on the bad faith claim because "the law was clear regarding the issues in AIG's motion and, hence, there were no genuine issues of material fact." ICA's SDO at 7. It is possible that the ICA's reasoning mirrored the circuit court's in placing significant stock in AIG's argument that there was an open question of law regarding the applicability of *Pacific Rent–All*, 90 Hawai'i 315, 978 P.2d 753. *See also Enoka v. AIG Hawai'i Ins. Co.*, 109 Hawai'i 537, 552–53, 128 P.3d 850, 865–66 (2006) (explaining that auto insurers do not act in bad faith when they deny payment based on "an open question of law."). However, the ICA's holding rested on the faulty premise that Ross's July 30, 2003 letter did not deny consent to settle. Ross's July 30, 2003 made no mention of an "open question of law" as a basis for AIG's initial outright rejection of the possibility of a settlement, and, in any event, genuine issues of material fact regarding the reasonableness and good

faith of AIG's interpretation of its policy remain, wholly separate and apart from the applicability of the *Pacific Rent–All* case.

Summary judgment is appropriate, *inter alia*, only when "there is no genuine issue as to any material fact." *Kahale*, 104 Hawai'i at 344, 90 P.3d at 236. A reasonableness standard governs bad faith claims. *Best Place*, 82 Hawai'i at 133, 920 P.2d at 347. This court has held that "[r]easonableness can only constitute a question of law suitable for summary judgment 'when the facts are undisputed and not fairly susceptible of divergent inferences,' because, '[w]here, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury.'" *Courbat v. Dahana Ranch, Inc.*, 111 Hawai'i 254, 263, 141 P.3d 427, 436 (2006) (quoting *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 108, 839 P.2d 10, 24 (1992)); *see also Tran v. State Farm Mut. Auto. Ins. Co.*, 999 F.Supp. 1369, 1373 (D.Haw.1998) (concluding that allegations of bad faith between insurer and insured over fair dealing and meaning of policy were "exactly the type of issue[s], under *Best Place*, that the jury should consider, and one[s] that should not be made by the court"). In the present case, we conclude that there are genuine issues of material fact as to whether AIG breached its duty of good faith by (1) denying consent to settle on the ground that Senaga was financially secure and (2) unreasonably interpreting its policy as requiring that the Guajardos pursue Senaga to judgment as a precondition to receiving UIM benefits. *See Best Place*, 82 Hawai'i at 133, 920 P.2d at 347 (an unreasonable interpretation of a policy constitutes bad faith); *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La.1994) ("An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge *or to restrict* its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion.") (Emphasis added.) (Citations omitted.) Accordingly, we hold that the ICA erred in affirming the circuit court's grant of partial summary judgment on the Guajardos' bad faith claim.

B. *The ICA Erred In Holding That Even If AIG Had Misrepresented The Terms Of The Policy, The Misrepresentation Would Not Have Prejudiced The Guajardos.*

The Guajardos next assert that the ICA gravely erred in holding that, "even if AIG had misrepresented the terms of the . . . AIG policy, it would not have prejudiced the Guajardos." The ICA's holding appears to be that, notwithstanding any wrongful misrepresentation, the Guajardos, as a matter of law, suffered no damages as a result. The extent of damages caused by tortious conduct normally constitutes a question of fact. *See Matsuura v. E.I. du Pont de Nemours and Co.*, 102 Hawai'i 149, 172, 73 P.3d 687, 710 (2003) (" '[J]uries in actions at law have historically determined issues of fact . . . and money damages in particular.' " (Quoting *Housing Fin. & Dev. Corp. v. Ferguson*, 91 Hawai'i 81, 90, 979 P.2d 1107, 1116 (1999).)).

There is at least a genuine issue of material fact as to whether AIG's persistent reliance on an unreasonable interpretation of its UIM policy subsequently caused "an unreasonable delay in payment of benefits [that] warrant[s] recovery for compensatory damages." *Best Place*, 82 Hawai'i at 133, 920 P.2d at 347 (citations omitted). There is also a genuine issue of material fact as to whether AIG's initial refusal to consider a potentially available and expedient avenue of resolving the Guajardos' tort claim, namely, a settlement with the tortfeasor that preserved AIG's subrogation rights, caused the controversy to drag on far longer than necessary, thereby inducing the Guajardos to incur both pre-lawsuit attorney's fees and loss of interest on principal. *See Brandt v. Superior Court*, 37 Cal.3d 813, 210 Cal.Rptr. 211, 693 P.2d 796, 798 (1985) (explaining that, "[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense," but that such fees do not include "those attributable to the bringing of the bad faith action itself"); *cf. Zanakis–Pico v. Cutter Dodge, Inc.*, 98 Hawai'i 309, 320, 47 P.3d 1222, 1233 (2002) ("[I]n order to maintain a claim for relief grounded in fraud or deceit, the plaintiff must have suffered substantial actual damage, not nominal or speculative." (Citation and emphasis omitted.)) Accordingly, we hold that the ICA erred in concluding as a matter of law that any unreasonable interpretation of the policy by AIG would not have prejudiced the Guajardos.[5]

## IV. CONCLUSION

For the foregoing reasons, we vacate the circuit court's partial summary judgment in favor of AIG and against the Guajardos with respect to the Guajardos' bad faith claim, and remand this case to the circuit court for further proceedings consistent with this opinion.[6]

---

5. The Guajardos' further argue that the ICA erred in holding that "no Hawai'i law required AIG to conduct an independent investigation into Senaga's income and assets." In our view, it is immaterial whether the ICA erred or not because its holding is inapposite. *Taylor* held that carriers are entitled to condition their consent to settle on the protection of their right of subrogation. 90 Hawai'i at 311, 978 P.2d at 749. In the face of a request for consent to settle, *Taylor* concluded that insurers are required to conduct a reasonable investigation:

> [I]nasmuch as an insurer must act in good faith . . . it must have a reasonable basis for its assertion that it is denying settlement based on the preservation of its subrogation interests. "If the carrier denies the claims of its insured without a good faith investigation into its merits, or if the carrier does not conduct its investigation in a reasonable time," [*Allstate Ins. Co. v.JBeavers*, 611 So.2d [348,] 351 [ (Ala.1992) ], the carrier may not deny UIM benefits to the insured.

*Id.* (citation and emphasis omitted). In this case, however, Ross's July 30, 2003 letter unequivocally reflected that AIG was denying consent to settle on the illegitimate ground that Senaga was financially secure. Insofar as the denial of consent to settle was improper from the outset, any investigation regarding Senaga's financial condition conducted by AIG, whether "reasonable" or not, could not have cured its arguable bad faith. Accordingly, the ICA's holding regarding the requirement of an independent investigation is surplusage and therefore inapposite.

6. In light of our vacating and remanding this case, the Guajardos' claim that the ICA erred in affirming the circuit court's denial of the Guajardos' HRCP Rule 56(f) request for further discovery is moot, as the Guajardos are now entitled to conduct further discovery.

Concurring Opinion by ACOBA, J.

I concur in the majority's conclusion that the bad faith claim of Petitioners/Plaintiffs–Appellants/Cross–Appellees Bang Ja Guajardo and Richard Guajardo (Petitioners) should not have been disposed of on summary judgment, and must be remanded. However, I respectfully disagree that, on remand, the Petitioners are limited to proving that they suffered actual damages in order to prevail on the bad faith claim.

The majority quotes *Zanakis–Pico v. Cutter Dodge, Inc.*, 98 Hawai'i 309, 320, 47 P.3d 1222, 1233 (2002), for the proposition that "in order to maintain a claim for relief grounded in fraud or deceit, the plaintiff must have suffered substantial actual damage, not nominal or speculative." Majority opinion at 207, 187 P.3d at 591 (brackets omitted). This rule related to the Picos' claims that Cutter Dodge had committed negligent misrepresentation and fraud in advertising the sales price of a vehicle. *Zanakis–Pico*, 98 Hawai'i at 320, 47 P.3d at 1233. As to this matter, the majority in *Zanakis–Pico* concluded that the three to five dollars the plaintiffs estimated they had spent in responding to the allegedly misleading advertisement amounted to "substantial actual damage[s]" on which a fraud claim could be based. *Id.*

In my concurring opinion in *Zanakis–Pico*, it was concluded that *nominal* damages would be sufficient to sustain a cause of action for fraud. *Id.* at 330, 47 P.3d at 1243 (Acoba, J., concurring) (stating that, "[a]s to the Picos' fraud allegation, nominal damages, properly defined, ... may be a basis for punitive damages in fraud actions, because the aim of punitive damages is to punish the defendant, rather than to compensate the plaintiff"). That opinion noted that the Picos had inaccurately described their actual damages (the money they had spent on gasoline) as "nominal" damages. *Id.* at 326–27, 47

P.3d at 1239–40 (Acoba, J., concurring). It was explained that minimal compensatory damages, such as those claimed by the Picos, must be distinguished from nominal damages, which are a token payment awarded for a technical violation that does not result in actual damages. *Id.* at 327–30, 47 P.3d at 1239–43 (Acoba, J., concurring).

The proper definitions of categories of damages is critical because "in some cases" inaccurately referring to actual damages as nominal damages could "have dramatic effects on the ability to recover damages[.]" *Id.* at 327, 47 P.3d at 1240 (Acoba, J., concurring). However, this caution was not applicable to the Picos insofar as a claim for fraud could be premised on minimal compensatory as well as nominal damages. *See id.* at 330, 47 P.3d at 1243 (Acoba, J., concurring) (positing that, related to the Picos' fraud claim, punitive damages could be awarded in addition to nominal damages).

In the instant case, the majority concludes that there was a genuine issue of material fact as to whether the Petitioners suffered *actual damages* as a result of the delay in settling their claim. Majority opinion at 207, 187 P.3d at 591. However, I respectfully disagree that on remand, the Petitioners are limited to recovery based on proof of actual damages in order to prevail on the bad faith claim. To the contrary, I would hold that their bad faith claim can also proceed if based on nominal damages. *Cf. Zanakis–Pico*, 98 Hawai'i at 330, 47 P.3d at 1243 (Acoba, J., concurring).