Electronically Filed
Supreme Court
SCWC-15-0000396
30-SEP-2019
09:10 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

PATRICIA E.G. ADAMS, IN HER CAPACITY AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF BRENT ADAMS, AND IN HER PERSONAL CAPACITY,
Petitioner/Plaintiff-Appellant,

vs.

HAWAII MEDICAL SERVICE ASSOCIATION,
Respondent/Defendant-Appellee.

_____

SCWC-15-0000396

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000396; 1CC071001388)

September 30, 2019

NAKAYAMA, ACTING C.J., McKENNA, POLLACK, AND WILSON, JJ.,
AND CIRCUIT JUDGE SOMERVILLE,
IN PLACE OF RECKTENWALD, C.J., RECUSED

OPINION OF THE COURT BY WILSON, J.

Brent Adams ("Brent") was forty years old when he was diagnosed with stage III multiple myeloma, an aggressive and life-threatening form of bone marrow cancer. Doctors determined that Brent's best chance of survival was to undergo a tandem stem cell transplant in which he would receive a transplant of

his own stem cells, known as an autologous transplant, and, two to four months later, a stem cell transplant from a matched sibling donor, referred to as an allogenic transplant. Shortly after his diagnosis, Brent informed his insurance provider, Respondent/Defendant-Appellee Hawaii Medical Service Association ("HMSA"), of his intent to pursue autologous and allogenic transplants. Brent and HMSA worked closely for the next several months to ensure that Brent's treatment would be covered by insurance, but when Brent applied for coverage for the second phase of the treatment, the allogenic transplant, HMSA denied the claim. Less than three years after his diagnosis, Brent died.

Brent and his wife, Petitioner/Plaintiff-Appellant Patricia E.G. Adams ("Patricia"), filed the instant action alleging that HMSA acted in bad faith in administering Brent's claim for the allogenic transplant; following Brent's death, Patricia pursued the action in her capacity as personal representative of Brent's estate and in her individual capacity. There are genuine issues of material fact as to whether HMSA fulfilled its duty of good faith and fair dealing in its handling of Brent's claim. Therefore, the Intermediate Court of Appeals ("ICA") erred when it affirmed the holding of the Circuit Court of the First Circuit ("circuit court") that there

2

are no genuine issues of material fact regarding whether HMSA acted in bad faith.

## I.    Background

Brent was diagnosed with stage III multiple myeloma in August 2005.  He informed HMSA of his condition on November 1, 2005 and requested information regarding facilities that provide stem cell transplants.  HMSA directed Brent and Patricia to seek treatment at City of Hope, an HMSA-approved Blue Quality Center for Transplant located in Duarte, California.[1]  Dr. Anthony Stein ("Dr. Stein") enrolled Brent in a clinical trial for stem cell transplants at City of Hope on December 29, 2005.  At the time of his diagnosis, Brent was a member of the HMSA Preferred Provider Plan for Hawaii Employer-Union Health Benefits Trust Fund ("the Plan").  Under Chapters 4 and 5 of the Plan, Brent was required to submit a precertification[2] request by mail or fax to HMSA seeking approval for the autologous and allogenic transplants.  HMSA had fifteen days to respond to a non-urgent request.

---

[1]    A Blue Quality Center for Transplant "is a centers of excellence bone marrow program offered through participating Blue Cross Blue Shield Plans."

[2]    The Plan defines "precertification" as "a special approval process to ensure that certain medical treatments, procedures, or devices meet payment determination criteria prior to the service being rendered."

HMSA assigned case managers to oversee Brent's case and they created a log of notes and communications.[3]  According to HMSA's log, Patricia notified HMSA that she and Brent were leaving for City of Hope on December 11, 2005 to pursue "testing and consultation[.]"  Patricia states in her declaration that she told HMSA that Brent was going to City of Hope specifically for the autologous and allogenic transplants and asked if there was anything else that Brent needed to do to inform HMSA of the treatment plan.  She alleges that HMSA did not provide any further instructions.

On December 15, 2005, Dr. Stein submitted a precertification request for an autologous transplant.  The request notes that Brent's siblings would be tested to determine if they could serve as stem cell donors, in which case Brent would consider pursuing an allogenic transplant following the autologous transplant.  HMSA timely approved the request for an autologous transplant on December 21, 2005.  Two days later, City of Hope submitted an "urgent" precertification request to test Brent's siblings' stem cells.  The request was rescinded, however, when HMSA explained to Dr. Stein that HMSA would only pay for the matched sibling donor if, and when, there was a

---

[3]    Patricia claims that "[m]any of the things in [the log] do not square with the facts, and many of the things [the case managers] wrote either would not have been said or seem to be things they added which were not discussed."

4

match. HMSA told Dr. Stein that "[o]nly the testing for the person donating to this member will be paid for. If all 5 siblings are tested, only the donor sibling testing will be paid for." This effectively meant that Brent and Patricia would pay out-of-pocket to test Brent's five siblings, and if one of the siblings matched, HMSA would reimburse Brent and Patricia for the cost of testing the matched sibling.

Brent underwent an autologous transplant in January 2006. In preparation for the second phase of the treatment, the allogenic transplant, Dr. Stein contacted HMSA regarding Brent's participation in City of Hope's clinical trial for stem cell transplants. HMSA's log indicates that HMSA informed Dr. Stein that clinical trials require precertification approval and are assessed on a case-by-case basis. HMSA referred Dr. Stein to the precertification division and recommended that he submit data supporting the efficacy of the clinical trial.

In January and February 2006, Brent and Patricia communicated numerous times with HMSA about Brent's intent to undergo the second phase of his treatment—the allogenic transplant. On January 17, 2006, HMSA informed Patricia that Dr. Stein had yet to submit a precertification request for the allogenic transplant. On February 6, 2006, HMSA faxed Dr. Stein information regarding the process to submit a precertification request for an allogenic transplant and noted that this request

was required "if they plan to do anything other than the tandem autologous transplant."[4]  On February 22, 2006, Brent informed HMSA that one of his siblings appeared to be a match and he hoped to pursue the allogenic transplant.  HMSA replied that a precertification request must be submitted and advised Brent that "[i]n terms of the care plan, the goals remain appropriate and on target[.]"  Patricia checked on the status of the process two weeks later, on February 27, 2006, and HMSA informed Patricia that Dr. Stein had yet to submit a precertification request for an allogenic transplant.  HMSA noted that Patricia wanted Dr. Stein to complete the precertification request because they were "desperately trying to avoid any delays" and "with the possibility that an allo transplant may be needed, they will need as much advance notice as possible[.]"  Patricia maintains that the autologous and allogenic transplants were recommended by Dr. Stein and accepted by HMSA as Brent's treatment plan from the beginning, as evidenced by his attempt to enroll in the clinical trial for stem cell transplants on December 29, 2005.  HMSA advised Patricia that each phase of the treatment required precertification authorization.

---

[4]     A tandem autologous transplant refers to two autologous transplants in a row, as opposed to a tandem autologous-allogenic transplant.

On March 2, 2006, Dr. Stein submitted a precertification request for an allogenic transplant.[5]  Four days later, on March 6, 2006, HMSA notified Dr. Stein that the request was denied because the procedure was "investigational." A formal denial letter was mailed on March 8, 2006.  Patricia and Brent were "taken by surprise[.]"  They viewed the denial as an abrupt change of position for HMSA, especially in light of the fact that Brent had a matched sibling donor.  Without approval for an allogenic transplant, and wary of further delays in his treatment, Brent underwent a second autologous transplant in April 2006, instead of an allogenic transplant.

In February 2007, Dr. Stein submitted another precertification request for an allogenic transplant.  This, too, was denied.  HMSA's internal appeals board upheld the denial of coverage because multiple myeloma was not listed as a condition for which an allogenic transplant was covered under the Plan.[6]  Shortly thereafter, Brent filed a request for an

---

[5]     In his deposition, Dr. Stein explained that he waited to file the precertification request for the allogenic transplant because he was under the impression that he could not submit the request until it was determined whether one of Brent's siblings could serve as a stem cell donor.

[6]     Chapter 6 of the Plan provided "[y]ou are not covered for transplant services or supplies or related services or supplies other than those described in *Chapter 4:  Description of Benefits* under *Organ and Tissue Transplants*.  **Related Transplant Supplies** are those that would not meet payment determination criteria but for your receipt of the transplant, including, and without limitation, all forms of bone marrow or peripheral stem cell transplants."  Multiple myeloma was not included in the list of conditions for which allogenic transplants were covered in Chapter 4.

expedited external review of HMSA's 2007 denial of coverage for the allogenic transplant with the Insurance Commissioner of the Department of Commerce and Consumer Affairs ("Insurance Panel"). In its April 18, 2007 Findings of Fact, Conclusions of Law, and Discussion and Order ("FOFs, COLs, and D&O"), the Insurance Panel reversed HMSA's 2007 denial of coverage. The Insurance Panel found that although the allogenic transplant was not specifically included under the Plan, it was not specifically excluded either, and HMSA failed to consider professional standards of care and expert opinions in concluding that the efficacy of allogenic transplants was not supported by sufficient evidence. The Insurance Panel ordered HMSA to provide coverage for an allogenic transplant. Brent finally received an allogenic transplant covered by HMSA in 2007, but he died approximately one year later.

### A. Procedural History

#### 1. Related Appeals

HMSA appealed the Insurance Panel's decision that the allogenic transplant was covered under the Plan to the circuit court. Shortly thereafter, Brent and Patricia filed the instant case in circuit court asserting claims for breach of contract, bad faith, intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"), and punitive damages. The circuit court stayed the instant case

pending the resolution of HMSA's appeal of the Insurance Panel's determination granting coverage for the allogenic transplant.[7]

HMSA's appeal from the Insurance Panel's decision to provide coverage for the allogenic transplant was affirmed by the circuit court; the circuit court held that the allogenic transplant was covered under the Plan.  HMSA appealed to the ICA and the ICA reversed the circuit court, holding that coverage for an allogenic transplant was expressly excluded under the terms of the Plan.  Haw. Med. Serv. Ass'n v. Adams, 120 Hawai'i 446, 457, 209 P.3d 1260, 1271 (App. 2009) ("Adams I").  Because the ICA found that the allogenic transplant was not covered, it vacated the circuit court's judgment and remanded to the circuit court with instructions to reverse the Insurance Panel's FOFs, COLs, and D&O granting coverage for the allogenic transplant. Id.

After the circuit court reversed the Insurance Panel's FOFs, COLs, and D&O pursuant to the ICA's order, HMSA moved to lift the stay and sought summary judgment on all claims in the instant case, which included breach of contract, bad faith, IIED, NIED, and punitive damages.[8]  The circuit court granted

---

[7]    The Honorable Eden E. Hifo presided.

[8]    By this time, Brent had passed away.  Patricia continued the lawsuit in her capacity as personal representative of the estate of Brent and in her individual capacity.

summary judgment in favor of HMSA on all claims. On appeal, the ICA affirmed in part and reversed in part the circuit court's judgment. Adams v. Haw. Med. Serv. Ass'n, No. 30314, 2013 WL 5443025, at *2 (App. Sept. 30, 2013) (SDO) ("Adams II"). The ICA affirmed the circuit court's grant of summary judgment in favor of HMSA as to the breach of contract claim. Id. at *2. It held that there were no genuine issues of material fact because it previously found, in Adams I, that the Plan expressly excluded coverage for allogenic transplants for the treatment of multiple myeloma. Id. at *1. Accordingly, the ICA affirmed the finding of the circuit court that HMSA did not breach its contract with Brent by refusing to cover the allogenic transplant. Id. at *1.

As to the bad faith claim, the ICA vacated the circuit court's entry of summary judgment in favor of HMSA on Brent's bad faith claim that HMSA mishandled his claim for an allogenic transplant. Id. at *2. In so doing, the ICA distinguished between an insurer's bad faith failure to investigate a claim and an insurer's bad faith mishandling of a claim. Id. at *1-2. The ICA noted that Patricia's bad faith claim was based on HMSA's unreasonable delay in notifying Brent that an allogenic transplant was not a covered benefit under the Plan. Id. at *2. The ICA emphasized that in her declaration, Patricia alleged that she had multiple conversations with HMSA's representatives

10

regarding the allogenic transplant in late 2005 and early 2006 and "they were not forthcoming with information crucial to the Adamses' understanding of coverage under the plan, and that later, in March 2006, when HMSA notified the Adamses that authorization for the procedure was denied, they were 'surprised.'" Id.

The ICA characterized Patricia's claim as "an insurer's bad faith mishandling of a claim, which would include an unreasonable handing of a claim, such as an unreasonable delay." Id. at *1. Based on Patricia's declaration, and the fact that HMSA introduced no evidence that the March 2, 2006 request for an allogenic transplant was reasonably handled, the ICA held that it could not conclude, as a matter of law, that HMSA reasonably handled Brent's claim for an allogenic transplant. Id. at *2. Similarly, the ICA found that "based on the evidence presented below, we cannot say that, as a matter of law, the Adamses did not present a prima facie case for their NIED and IIED claims in opposition to HMSA's motion for summary judgment." Id. Accordingly, the ICA vacated the circuit court's grant of summary judgment in favor of HMSA as to the NIED and IIED claims, as well as the bad faith claim based on

11

HMSA's mishandling of the claim.[9]  Id.  It affirmed the circuit

court's judgment in all other respects and remanded the case to

the circuit court for further proceedings.  Id.

### 2.    The Instant Appeal

#### a)    Circuit Court Proceedings

On remand to the circuit court, Patricia asserted that

HMSA mishandled Brent's claim for an allogenic transplant and

therefore acted in bad faith.  She also maintained her claims

for IIED, NIED, and punitive damages.  As to the bad faith

claim, Patricia argued that HMSA knew that Brent was seeking an

allogenic transplant and misled her by providing assurances that

an allogenic transplant would be covered under the Plan.  She

claimed that HMSA intentionally "kept silent" its policy to

exclude coverage for allogenic transplants for the treatment of

multiple myeloma.  By remaining silent about its policy,

Patricia argued, HMSA intentionally delayed the denial of

coverage to deprive Brent of the opportunity to appeal the

---

[9]     The ICA affirmed the circuit court's entry of summary judgment in favor of HMSA on Patricia's claim for bad faith based on HMSA's failure to investigate.  Adams II, 2013 WL 5443025, at *2.  It addressed Patricia's contention that HMSA acted in bad faith by failing to investigate the claim "by refusing to consider new evidence in 2007 that allo-transplants had been established as the gold standard for treating patients in Brent's circumstances."  Id.  The ICA noted that "an insured [cannot] recover for the tort of bad faith failure to investigate where the insured could not establish liability on the part of the insurer on the underlying policy."  Id. (alteration and emphasis in original) (quoting Enoka v. AIG Hawai'i Ins. Co., 109 Hawai'i 537, 551, 128 P.3d 850, 864 (2006)).  Because there was no liability on the part of HMSA to pay for the allogenic transplant, the ICA held that a claim based on HMSA's failure to investigate the claim could not lie.  Id.

decision. Patricia argued that HMSA mishandled the claim by failing to timely inform Brent that the allogenic transplant was not covered under the Plan and, therefore, breached the duty of good faith and fair dealing implied in the insurance contract.

HMSA denied Patricia's allegations and brought a motion for summary judgment on all claims. HMSA argued that it was entitled to summary judgment on the bad faith claim, specifically, because: (1) the two-day period to deny coverage was objectively reasonable, (2) HMSA did not "keep silent" its policy on allogenic transplants for multiple myeloma, and (3) it did not intentionally deprive Brent of the opportunity to appeal the decision. The circuit court agreed and granted HMSA's motion for summary judgment as to all claims.

### b) ICA Proceedings

On appeal to the ICA, Patricia challenged the circuit court's grant of summary judgment on the bad faith claim, in part, on the basis that the record contained genuine issues of material fact with regard to whether HMSA acted in bad faith by mishandling Brent's claim.[10] In its June 8, 2018 summary

---

[10] Patricia alleged three other points of error, none of which are before this court. She argued that: (1) there was a genuine issue of material fact as to whether City of Hope and Dr. Stein acted as HMSA's agents; (2) City of Hope was not required to identify a matched donor prior to submitting the precertification request; and (3) the circuit court abused its discretion by failing to order a continuance to provide Brent an opportunity to obtain affidavits from his siblings in New Zealand.

disposition order, the ICA affirmed the circuit court's order granting summary judgment in favor of HMSA. Adams v. Haw. Med. Serv. Ass'n, CAAP-15-0000396, 2018 WL 2753319, at *4 (App. June 8, 2018) (SDO) ("Adams III"). The ICA determined that no genuine issues of material fact exist regarding whether HMSA mishandled the claim because HMSA denied the precertification request for the claim within the time period required under the Plan. Id. at *3. Noting that Chapter 5 of the Plan explicitly directed the insured to submit a written precertification request, the ICA found that the absence of such a request meant there was no claim for HMSA to process. Id. The ICA noted that Brent's request for an allogenic transplant was first submitted on March 2, 2006, and within four days HMSA responded to the request by calling Dr. Stein to inform him that the request was denied; the ICA also found significant that a formal denial letter was dispatched six days later on March 8, 2006. Id. Because HMSA responded to the request within fifteen days, as required under the Plan, the ICA held as a matter of law that HMSA timely replied to the request. Id.

The ICA noted that "the duties of good faith and fair dealing implied in every insurance contract[] arise after the insured complies with the claims procedure described in the insurance policy." Id. (citing Safeco Ins. Co. of Am. v. Parks, 88 Cal. Rptr. 3d 730, 740 (Cal. Ct. App. 2009)). Thus, the ICA

14

held, HMSA's duty of good faith did not arise until Brent complied with the claims procedure under the Plan by submitting a formal precertification request for an allogenic transplant. Id. Because Brent submitted the request on March 2, 2006 and HMSA timely responded four days later, on March 6, 2006, the ICA held that HMSA did not mishandle Brent's claim. Id. It affirmed the circuit court's entry of summary judgment in favor of HMSA on all claims, including the bad faith mishandling claim. Id. at *4.

## II.  Standard of Review

An appellate court reviews "the circuit court's grant or denial of summary judgment de novo." Querubin v. Thronas, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005). This court has also articulated that:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Id. (alteration in original) (quoting Haw. Cmty. Fed. Credit Union v. Keka, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)).

Hawai'i Rules of Civil Procedure ("HRCP") Rule 56(e) (2000) provides in relevant part:

15

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Thus, "[a] party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, 'nor is he [or she] entitled to a trial on the basis of a hope that he [or she] can produce some evidence at that time.'" Henderson v. Prof'l Coatings Corp., 72 Haw. 387, 401, 819 P.2d 84, 92 (1991) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2727 (1983)).

### III. Discussion

The issue in this case is whether, viewing the evidence in the light most favorable to Patricia, the record contains evidence establishing that HMSA committed the tort of bad faith by unreasonably handling Brent's claim for an allogenic transplant. It is well settled in this jurisdiction that in every first-party insurance contract, the implied covenant of good faith and fair dealing ensures "that neither party will do anything that will deprive the other of the benefits of the agreement." Best Place, Inc. v. Penn Am. Ins. Co., 82 Hawai'i 120, 123-24, 920 P.2d 334, 337-38 (1996). A breach of this covenant is referred to as "bad faith." Id. at

16

127, 920 P.2d at 341.  When an insurer acts in bad faith, it gives rise to a cause of action for the tort of bad faith.

> [T]he tort of bad faith is not a tortious breach of contract, but rather a separate and distinct wrong which results from the breach of a duty imposed as a consequence of the relationship established by contract.  Therefore, the tort of bad faith allows an insured to recover even if the insurer performs the express covenant to pay claims.  As such, an insurer could be liable for the tort of bad faith for certain conduct where it would not be liable for a tortious breach of contract.

Id. at 131, 920 P.2d at 345 (internal quotation marks and citation omitted).  Thus, the tort of bad faith does not arise from a breach of the terms of the contract, but rather, from a breach of a duty to act in good faith inherent in the relationship between the insurer and the insured.

A claim for bad faith arising from the relationship between the insurer and the insured can be grounded in an "unreasonable handl[ing]" of the insured's claim.  Francis v. Lee Enter., Inc., 89 Hawai'i 234, 238, 971 P.2d 707, 711 (1999).  "This court has held that reasonableness can only constitute a question of law suitable for summary judgment when the facts are undisputed and not fairly susceptible of divergent inferences, because, where, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury."  Willis v. Swain, 129 Hawai'i 478, 496, 304 P.3d 619, 637 (2013) (internal quotation marks omitted) (quoting Guajardo v. AIG Haw. Ins., 118 Hawai'i 196, 206, 187 P.3d 580, 590 (2008)).  Consequently, the

17

issue of whether HMSA "unreasonably handle[d,]" Francis, 89 Hawai'i at 238, 971 P.2d at 711, Brent's claim for an allogenic transplant is suitable for summary judgment if the only inference to be reasonably drawn from the record is that HMSA reasonably handled the claim for the allogenic transplant, Willis, 129 Hawai'i at 496, 304 P.3d at 637.

To determine whether an insurer reasonably handled a claim, we consider the conduct of the parties to the contract before and after the formal submission of the claim. See Guajardo, 118 Hawai'i at 202-07, 187 P.3d at 586-91. In Guajardo, the plaintiff was struck by a vehicle while she was crossing the street. 118 Hawai'i at 198, 187 P.3d at 582. The insurer of the driver of the vehicle offered to settle the plaintiff's claim for $100,000, but the plaintiff's insurer, AIG Hawai'i Insurance Company, Inc. ("AIG"), refused to authorize the settlement. Id. AIG required the plaintiff to obtain a judgment against the driver "to protect [AIG's] subrogation rights as required under her policy." Id. The plaintiff filed suit against AIG, alleging that it acted in bad faith by misrepresenting that the policy required the plaintiff to pursue the driver to judgment. Id. at 202, 187 P.3d at 586. This court analyzed AIG's conduct starting at "[t]he first communication" between the plaintiff and AIG, when the plaintiff reported that she had been hit by a vehicle. Id. at 203, 187

P.3d at 587.  Review of the conduct of AIG throughout the course of the claims process revealed genuine issues of material fact as to whether AIG breached its duty of good faith by unreasonably handling the claim.  Id. at 206, 187 P.3d at 590.

Similarly, in the instant case, it is necessary to examine the relationship between the insurer and the insured throughout the entire claims process, starting from "[t]he first communication" between the parties, to determine whether the insurer acted in bad faith.  Id. at 203, 187 P.3d at 587.  It is not sufficient to determine only whether the insurer complied with the terms of the contract.  Best Place, 82 Hawai'i at 131-32, 920 P.2d at 346-47; see also Enoka, 109 Hawai'i at 552, 128 P.3d at 865 ("Surely an insurer must act in good faith in dealing with its insured and in handling the insured's claim, even when the policy clearly and unambiguously excludes coverage.").  Here, the ICA analyzed HMSA's conduct without considering its conduct throughout the duration of its relationship with Brent, starting with the first communication. The ICA's analysis was limited to the period from the day the precertification request was filed, March 2, 2006, to the day the request was denied, March 6, 2006.  Adams III, 2018 WL 2753319, at *3.  It found that HMSA handled Brent's claim in a reasonable manner when it responded to his claim for benefits within four days of receipt of the request, as required under

19

the Plan. Id. The covenant of good faith and fair dealing implied in the insurance contract, however, required HMSA to act in good faith before and after the formal submission of the claim. See Best Place, 82 Hawai'i at 131-32, 920 P.2d at 345-46. Thus, the ICA erred because it did not examine the conduct of the parties before the formal submission of the claim on March 2, 2006.

Taking into consideration HMSA's conduct throughout its entire contractual relationship with Brent, the record contains facts that are "fairly susceptible of divergent inferences," Willis, 129 Hawai'i at 496, 304 P.3d at 637 (citation omitted), regarding whether HMSA "unreasonably handle[d]" Brent's claim for an allogenic transplant, Francis, 89 Hawai'i at 238, 971 P.2d at 711. HMSA became aware that Brent was considering pursuing an allogenic transplant on December 15, 2005, but did not inform him that an allogenic transplant was not a covered benefit under the Plan until after the claim was submitted on March 2, 2006. In light of the evidence in the record, a reasonable inference could be made that HMSA's failure during this two and a half month period to inform the Adamses that an allogenic transplant was not covered under the Plan could have led Brent and Patricia to believe that an allogenic transplant was covered.

20

There is further evidence in the record that could support the inference that HMSA unreasonably handled the claim because it was aware that Brent was attempting to test his five siblings to determine if one was a match, and yet, did not inform Brent that the treatment was not covered under the Plan. The December 15, 2005 precertification request for an autologous transplant noted that Brent's siblings would be tested to determine if they could serve as stem cell donors, and that if one of them could, Brent would consider pursuing an allogenic transplant. Two days later, on December 17, 2005, City of Hope submitted an urgent precertification request to test Brent's siblings' stem cells in the hopes that one of the siblings would match and Brent would be eligible for an allogenic transplant. The request was rescinded, however, when HMSA explained to Dr. Stein that it would only pay for testing if one of the siblings proved to be a matching donor. Brent and Patricia paid out-of-pocket to test Brent's five siblings to determine whether he was eligible for an allogenic transplant. Thus, the record could support the inference that HMSA unreasonably handled the claim because it was aware that Brent was taking steps to pursue the treatment by having his siblings tested, but did not inform Brent that an allogenic transplant was not covered under the Plan. Instead, HMSA's conduct may have implied that an allogenic transplant was covered because it assured Brent that

if one of his siblings was a match, HMSA would pay for the cost of testing that sibling.

In the two months preceding the formal submission of the claim on March 2, 2006, there is evidence that HMSA continually instructed Brent to submit a precertification request for an allogenic transplant and assured Brent that his "care plan" and "goals remain appropriate and on target[.]" This could also support the inference that HMSA "unreasonably handle[d]" the claim by leading Brent and Patricia to believe that an allogenic transplant was covered under the Plan. Francis, 89 Hawai'i at 238, 971 P.2d at 711. According to HMSA's log of its communications with Brent and Patricia, on January 17, 2006, Patricia discussed with HMSA Brent's intent to pursue the allogenic transplant if one of his siblings could serve as a donor. Also according to the log, on February 22, 2006, Brent informed HMSA that it appeared that his sibling was a match and "he didn't want to wait until the last minute to get [the allogenic transplant] approved and wanted to know what needs to happen[.]" HMSA advised Brent that it sent Dr. Stein the necessary documentation and instructions for submitting the precertification request. HMSA also noted that "[i]n terms of the care plan, the goals remain appropriate and on target; no change in plan or acuity." Again, on February 27, 2006, Patricia stated that she checked on the status of approval for

the allogenic transplant and noted that they "were desperately trying to avoid any delays[.]"  She also stated that, "with the possibility that an allo transplant may be needed, they will need as much advance notice as possible[.]"  HMSA replied that it would send Dr. Stein another reminder to file the precertification request.  Dr. Stein submitted the precertification request on March 2, 2006 and HMSA denied the claim on March 6, 2006.  Dr. Stein stated in a deposition that he was surprised by HMSA's denial of coverage because, throughout months of contact, HMSA never indicated that an allogenic transplant was not covered under the Plan:

> My office and other City of Hope personnel had several contacts with HMSA in early 2006 attempting to obtain authorization for Brent's second tandem transplant to be an allogenic rather than autologous transplant, and we were never advised that allogenic transplant was not a benefit of Brent's Plan.

Patricia also described in her declaration being "taken by surprise" when HMSA denied the claim "because no one had ever mentioned anything about HMSA denying the allo transplant. . . . We could not understand how HMSA could suddenly change its position on covering the allo transplant when we knew Brent had a matched donor."  Thus, the statements of Dr. Stein and Patricia could constitute evidence that HMSA acted in a manner that may have led Brent, Patricia, and Dr. Stein to believe that the allogenic transplant was covered under the Plan, which could support an inference that HMSA unreasonably handled the claim.

23

As noted, "reasonableness can only constitute a question of law suitable for summary judgment when the facts are undisputed and not fairly susceptible of divergent inferences[.]" Willis, 129 Hawai'i at 496, 304 P.3d at 637 (internal quotation marks omitted) (quoting Guajardo, 118 Hawai'i at 206, 187 P.3d at 590). The foregoing facts are "fairly susceptible of divergent inferences," id., namely that HMSA may or may not have "unreasonably handle[d]" Brent's claim for an allogenic transplant. Francis, 89 Hawai'i at 238, 971 P.2d at 711. Because divergent inferences may be reached based on the facts of this case, the issue of whether HMSA "unreasonably handle[d]" Brent's claim for an allogenic transplant is not suitable for summary judgment. Id.

## IV. Conclusion

HMSA's duty of good faith and fair dealing arose as a consequence of the relationship established by the insurance contract entered into by Brent and HMSA. Evidence of HMSA's conduct during its relationship with Brent raises genuine issues of material fact as to whether HMSA "unreasonably handle[d]" Brent's claim for an allogenic transplant. Id. We vacate the ICA's July 6, 2018 judgment on appeal affirming the circuit court's grant of HMSA's motion for summary judgment on the bad faith claim and also vacate the circuit court's order granting summary judgment in favor of HMSA as to the bad faith claim. We

24

remand to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Rafael G. Del Castillo | /s/ Paula A. Nakayama |
| Robert H. Thomas | |
| Tred R. Eyerly | /s/ Sabrina S. McKenna |
| Joanna C. Zeigler | |
| for Petitioner | /s/ Richard W. Pollack |
| | |
| Dianne Winter Brookins | /s/ Michael D. Wilson |
| John-Anderson L. Meyer | |
| for Respondent | /s/ Rowena A. Somerville |

